936 A.2d 987 (2007)
397 N.J. Super. 184
Mohammed KHAN and Tasmih Khan, his wife, Plaintiffs-Appellants,
v.
Sunil K. SINGH, M.D.; Minimally Invasive Surgery Center; Interventional Neurology, Headache & Pain Relief Center, Defendants-Respondents, and
Trimedyne, Inc., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 2007.
Decided December 12, 2007.
*990 Kenneth G. Andres, Jr., Haddonfield, argued the cause for appellants (Andres & Berger, attorneys; Mr. Andres, on the brief).
Thomas B. Reynolds, Absecon, argued the cause for respondents (Reynolds & Drake, attorneys; Mr. Reynolds and John J. Bannan, on the brief).
Before Judges SKILLMAN, WINKELSTEIN and YANNOTTI.
The opinion of the court was delivered by
YANNOTTI, J.A.D.
Plaintiff Mohammed Khan filed a complaint against defendants Sunil Singh, M.D., Minimally Invasive Surgery Center, and Interventional Neurology, Headache and Pain Relief Center, seeking damages for personal injuries allegedly sustained as a result of certain medical treatment rendered by Dr. Singh.[1] The matter was tried to a jury, which returned a verdict of no cause for action. Plaintiff appeals from the judgment entered for defendants on August 21, 2006, and the order entered on September 20, 2006, which denied his motion for a new trial or judgment notwithstanding the verdict. For the reasons that follow, we affirm.

I.
According to the evidence presented at trial, plaintiff first began to experience low back pain sometime between 1983 and 1985. From that time until approximately 1992, plaintiff was treated by various doctors for his back pain. In October 1999, plaintiff began to experience increased pain in his back and left leg. Plaintiff was referred to Dr. Joseph Zerbo, a board-certified orthopedic surgeon. Dr. Zerbo found that plaintiff had an "antalgic gait"[2] and had "mild discomfort" in his lower back. He additionally found that plaintiff had "an acute footdrop on the left."[3] Dr. Zerbo made the following diagnosis: "Acute lumbar radiculopathy, most likely secondary to an acute lumbar disc herniation."[4]
*991 At Dr. Zerbo's recommendation, an MRI was performed on plaintiff's lumbar spine. The report of the MRI stated that plaintiff had a left paracentral disc protrusion at the L4-L5 level of the spine, degenerative disc disease from L2 to S1, and an annular tear at L5-S1. Dr. Zerbo discussed the results of the MRI with plaintiff and his wife, noting the "significance of having acute disc herniation with significant muscle weakness and a near foot drop." Dr. Zerbo recommended open surgery to remove the herniated disc fragment.
Plaintiff sought a second opinion from Dr. Singh, who is board certified in internal medicine, neurology, and pain medicine. Dr. Singh examined plaintiff and found a mild weakness in the dorsiflexion of the left foot. Dr. Singh prescribed a course of treatment that included medication, physical therapy, traction, vibration, and epidural injections. After three injections, plaintiff reported significant relief from the pain but said that he was still experiencing numbness in his left leg.
Dr. Singh recommended that plaintiff undergo a selective endoscopic discectomy with thermal annuloplasty. Plaintiff agreed, and Dr. Singh performed the procedure on May 10, 2000. Dr. Singh began with a diagnostic lumbar discogram by inserting dye through a needle into the disc at the L4-L5 level of plaintiff's spine. According to Dr. Singh, the dye showed a tear in the annulus, or lining of the disc. He said that the dye spread but not outside of the epidural space. Dr. Singh concluded that the contents of the disc had not extruded outside of the disc.
Dr. Singh then inserted a radiofrequency needle into the disc. The needle is used to heat the contents of the disc, causing the disc material to shrink, thereby relieving pressure against the nerve root. Dr. Singh testified that plaintiff showed no signs of traumatic nerve injury after the procedure. His discharge note states that plaintiff was ambulating and moving with a "steady gait."
Plaintiff testified that he was "knocked out" with anesthesia during the procedure and when he awoke, his left leg felt "extremely heavy." He said his "feet [did not] work." After two days, the pain kept increasing and became intolerable. Plaintiff returned to Dr. Singh's office on May 15, 2000. At that time, plaintiff could not push off with his foot. Plaintiff had to wear a brace to avoid tripping on his foot. On June 22, 2000, plaintiff saw a neurosurgeon and underwent a needle electromyography (EMG) to determine the cause of the foot drop. The EMG showed complete damage to the L5 nerve root.
At trial, plaintiff presented testimony from Dr. I. David Weisband, a board-certified orthopedic surgeon. Dr. Weisband testified that the radiofrequency procedure is contraindicated when disc material has extruded outside of the disc space. The doctor asserted that Dr. Singh's records indicated that he performed a discogram during the procedure and he observed an extruded fragment of the L4-L5 disc. According to Dr. Weisband, Dr. Singh should have stopped the procedure at that point because the extruded disc fragment could cause a burn injury to the nerve. Dr. Weisband noted that Dr. Gregory Bracchia, a spinal specialist, found that plaintiff's current symptomatology was consistent with a thermal injury to the L5 nerve root and radiculopathy. He agreed with Dr. Bracchia's view that plaintiff's nerve root had been "burnt and destroyed."
Dr. Weisband explained that the L5 nerve root is near the L4-L5 disc, which
comes down to the calf and outer surface of the leg and foot. It works dorsiflexion of the foot. That's . . . the importance of that. So that if you have an L5 nerve root intact you can bring *992 your foot up. So when you're walking you'll strike your heel first and then go onto your toes to push off. Without an L5 nerve root, which is the [nerve] at the dis[c] level that was operated on, you're going to have a floppy foot. You're not going to be able to bring the toes up and you're going to be tripping on your own foot.
Plaintiff also presented testimony from Dr. Kenneth Brait, a board-certified neurologist. The doctor stated that the radiofrequency procedure was contraindicated because plaintiff did not have a normal neurologlical exam. Dr. Brait said that the procedure also is contraindicated when an individual has a herniated disc with an extruded fragment. He said shrinking the material inside of the disc will not address the problem and the heat can travel to the herniated disc material and burn the nerve. Dr. Brait noted that plaintiff had a transient foot drop before the surgery but this condition had improved within a week. According to Dr. Brait, this indicated that at that time, plaintiff did not have a complete nerve injury.
Dr. Brait additionally stated that plaintiff's herniated disc could not have been the cause of his severe left L5 radiculopathy because the herniation was the same after the surgery as it was before. Dr. Brait noted that a comparison of the MRIs performed in October 1999 and in June 2000 indicated that the disc herniation was still present. Dr. Brait opined that plaintiff's condition was the result of a thermal injury to the nerve that occurred during the procedure.
Dr. Singh testified that his record erroneously indicated that he used a laser probe in the procedure. He said that he used a radiofrequency probe because the laser probe generates more heat and he believed a less aggressive approach was warranted in his treatment of plaintiff.
On cross examination, Dr. Singh agreed that the standard of care required that he avoid hitting the nerve root when performing the discectomy. He conceded that it would be malpractice if he hit the nerve root and damaged it during the procedure. Dr. Singh also agreed that it would be malpractice if he caused thermal damage to the nerve root while performing the procedure. However, Dr. Singh stated that he did not hit or burn plaintiff's nerve root during the procedure. Dr. Singh said the heat remained inside the disc. He added that plaintiff was lightly sedated, and "since [the] patient did not jump, no heat ever reached near the nerve."
Defendant's expert witness was Dr. Irving P. Ratner, a board-certified orthopedic surgeon. Dr. Ratner rejected the view that the radiofrequency procedure was contraindicated in this case. Dr. Ratner said that the medical literature indicates that the procedure should not be performed if there is a large or extruded herniated disc, not because it will cause harm to the patient, but rather because there is a lower rate of improvement in those circumstances.
Dr. Ratner said that Dr. Singh did not burn plaintiff's nerve root. He asserted that if that had occurred, plaintiff would have "jumped or jerked or moaned or screamed" because he was consciously sedated during the procedure. The doctor also stated that plaintiff would have experienced severe pain and immediately lost the use of his foot if his nerve root had been burned during the surgery.
Dr. Ratner added that there was no evidence that Dr. Singh had performed the procedure improperly. He said that everything in the operative report was "in keeping with the standard of care." He noted that Dr. Singh had erroneously indicated in his notes that he used a laser *993 probe rather than a radiofrequency probe but he did not view this error as a deviation from accepted standards of medical practice. Dr. Ratner asserted that the selection of the radiofrequency probe was a reasonable decision in this matter.
Dr. Ratner opined that plaintiff had a "sick nerve root" before the procedure and the surgery itself, through no fault of Dr. Singh's, caused "chemical changes" and a "chemical irritation" to the nerve. He explained:
[Plaintiff] presented to Dr. Singh with a sick nerve root, [the] L5 nerve root. Why was it sick? Because he went to Dr. Zerbo and he had a foot drop. He had sensory deficit. He had radiating leg pain, and you don't get those findings  even though they're transient maybe, you don't get them in a healthy nerve root. The nerve root which [plaintiff] brought to Dr. Singh was already partially damaged and probably the result of his long standing [disc] disease and maybe what happened to him in the short time before he started to treat with the Medical One people. And, it's known that whenever a surgeon or even an interventionalist irritates a nerve root by creating swelling or by manipulating it you have to realize that when I do a laminectomy and dis[c]ectomy I put a little hook on the nerve and I pull it over to get it out of the way so that . . . I can get in past it to get the [disc] out. And I have had patients wake up from the surgery with a foot drop. Fortunately all but one of them in my entire career got better by themselves over a couple of months.
But the idea is that blood in the area of the surgery, swelling, manipulation and et cetera can cause the chemical changes which in my opinion resulted in the furthering of [plaintiff's] problems and the foot drop that developed over a couple of days.
The idea is just like what Dr. Brait said. It's like a burn. It takes a few days to develop. The swelling, the chemical reaction has to become enough to cause the nerve to not function. And, in this case if you look at the EMG that was done after Dr. Singh's procedure, the [d]octor reported that the nerve was really badly damaged, but that doesn't mean that it was physically damaged. Nobody beat it with a hammer in my opinion. Nobody burned it or cooked it. It was a sick nerve that was further irritated and simply decided to shut down and it didn't work, and that's the science of how nerves get injured.
On cross examination, Dr. Ratner agreed that it would be a deviation from the standard of care if defendant performed the procedure in a manner that caused thermal damage to the nerve root. That was so because, if the procedure is done properly, the physician is "supposed to be inside the [disc]."
Dr. Ratner stated, however, that there was no indication that the probe was outside of plaintiff's disc during the procedure. He said that it would be a deviation from the standard of care for the disc material to become overheated to the point where it caused thermal injury. He explained that if thermal energy was applied "outside the parameters of the technique[,] it is possible to create enough heat in the wall of the [disc] to irritate or damage the nerve root[.]"

II.
Plaintiff argues that the judge erred by refusing to charge the jury on res ipsa loquitur. We disagree.
"The doctrine of res ipsa loquitur permits an inference of defendant's *994 negligence `where (a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of plaintiff's own voluntary act or neglect.'" Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981) (quoting Bornstein v. Metro. Bottling Co., 26 N.J. 263, 269, 139 A.2d 404 (1958)). "Whether an occurrence `ordinarily bespeaks negligence' depends on the balance of probabilities being in favor of negligence." Id. at 526, 435 A.2d 1150.
"[D]epending upon the probabilities," the doctrine can be applied in medical malpractice cases. Ibid. Accordingly, the res ipsa loquitur doctrine has been applied when, as a matter of common knowledge in the lay community, a particular accident would not have occurred "had the defendant adhered to the appropriate standard of his profession." Id. at 527, 435 A.2d 1150. Expert testimony also may provide the necessary factual basis for application of the doctrine. The Buckelew Court explained:
Expert testimony to the effect that those in a specialized field of knowledge or experience consider a certain occurrence as indicative of the probable existence of negligence is at least as probative of the existence of such a probability as the "common knowledge" of lay persons. . . . [E]xpert testimony to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence may afford a sufficient basis for the application of the doctrine of res ipsa loquitur.

[Id. at 527, 435 A.2d 1150.]
However, the res ipsa loquitur doctrine will not be applied merely because an expert witness asserts that it is common knowledge in the medical community that the mishap would not have occurred unless the defendant deviated from the applicable standard of care. Id. at 528-29, 435 A.2d 1150.
There must be some evidential support, experiential or the like, offered for the expert's conclusion that the medical community recognized that the mishap in question would not have occurred but for the physician's negligence. If the plaintiff's expert's direct and cross-examination provide no basis for the witness's "common knowledge" testimony other than the expert's intuitive feeling  in other words, no more than a flat-out statement designed to satisfy the "common knowledge" test  then the court should not apply the res ipsa doctrine to the proceedings.
[Id. at 529, 435 A.2d 1150.]
In this case, Dr. Weisband and Dr. Brait both testified that it is generally accepted in the medical community that a nerve will not be burned if the radiofrequency procedure is performed in accordance with the standard of care. However, neither Dr. Weisband nor Dr. Brait provided the "evidential support" required by Buckelew for application of the res ipsa loquitur doctrine. Neither expert supported his opinion with reference to any medical literature or his own particular experience.
Dr. Weisband conceded that he never performed a radiofrequency or laser disectomy on the spine, and he has never taught or instructed medical students, residents, or doctors on the performance of such procedures. Dr. Weisband has not authored any medical literature on the procedures. Similarly, Dr. Brait conceded that he has never been trained on how to perform the procedure, nor has he written or published any medical literature on the subject. Therefore, plaintiff's experts *995 failed to lay the foundation required by Buckelew for the res ipsa loquitur charge.
Our conclusion is supported by Hemmen v. Atl. City Med. Ctr., 334 N.J.Super. 274, 758 A.2d 1145 (Law Div.1999), aff'd o.b., 334 N.J.Super. 160, 757 A.2d 310 (App.Div. 2000). In that case, the plaintiff was admitted to the hospital complaining of abdominal pain and received an intramuscular injection of pain medication. Id. at 277, 758 A.2d 1145. The plaintiff thereafter "experienced symptoms of what ultimately proved to be permanent damage to his sciatic nerve." Ibid. The plaintiff's expert opined that while a non-negligent, intramuscular injection could migrate to the sciatic nerve, the occurrence was so infrequent that it could not be considered the cause of the plaintiff's injury. Id. at 277-78, 758 A.2d 1145.
The trial judge held that the opinion was insufficient to warrant application of the res ipsa loquitur doctrine. Id. at 281, 758 A.2d 1145. The judge noted that the doctrine is applicable when the result probably would not have occurred in the absence of negligence. Id. at 279, 758 A.2d 1145. The judge explained that there must be "proof that when a particular result occurs, it flows more times than not from a particular cause." Ibid.
The judge observed that in a medical malpractice case, unless lay persons can assess "the relative probability that the event was caused by negligent or non-negligent actions," there must be expert testimony to establish that the result is caused by negligence more often than not. Ibid. Furthermore, when an expert claims that the medical community recognizes that negligence is the most frequent cause of a particular injury, the opinion must be based on medical literature or the expert's experience. Id. at 280-81, 758 A.2d 1145.
Here, plaintiff's experts opined that Dr. Singh had negligently performed the radiofrequency discectomy and Dr. Singh's negligence was the cause of the injury to plaintiff's L5 nerve root. However, the experts did not explain the frequency with which such injuries result from negligence, and they failed to establish that a nerve injury similar to the injury at issue would probably not have occurred in the absence of negligence. Furthermore, as we have previously stated, although plaintiff's experts both asserted that the medical community recognizes that an injury of the sort sustained by plaintiff would not have occurred in the absence of negligence, those assertions were not supported by medical literature or the experts' experience.
Plaintiff argues, however, that the judge should have given the jury a conditional res ipsa charge. In support of this contention, plaintiff relies upon our decision in Roper v. Blumenfeld, 309 N.J.Super. 219, 706 A.2d 1151 (App.Div.1998). In that case, we stated that:
"[i]f the evidence presents a factual issue as to how an accident occurred, and the res ipsa loquitur doctrine would be applicable under only one version of the accident, the court should give a `conditional' res ipsa loquitur instruction, under which the jury is directed first to decide how the accident happened and to consider res ispa loquitur only if it finds that the accident occurred in a manner which fits the doctrine."
[Id. at 232, 706 A.2d 1151 (quoting Allendorf v. Kaiserman Enters., 266 N.J.Super. 662, 669, 630 A.2d 402 (App. Div.1993)).]
However, we are not convinced that a conditional res ipsa loquitur instruction was required in this case. Here, the parties disagreed as to the cause of plaintiff's injury. Plaintiff's experts insisted that the *996 L5 nerve had been burned during the procedure and that such an injury would not have occurred in the absence of negligence. However, Dr. Singh's expert maintained that plaintiff's nerve was compromised before the surgery, and the nerve was probably irritated and "shut down" even though Dr. Singh had performed the procedure in conformity with the applicable standard of care.
Thus, there were genuine issues of material fact on the issues of causation and negligence. The jury had the discretion as the fact-finder to weigh the opinions of the experts and determine whether it was more probable than not that Dr. Singh had negligently performed the procedure and whether his negligence was a proximate cause of plaintiff's injury. But, as we have explained, plaintiff's experts failed to lay the foundation required by Buckelew for an instruction that would have permitted the jury to draw the inference of negligence from the fact of the injury alone.
Indeed, it has long been recognized that, "[t]he practice of medicine according to accepted medical standards will sometimes lead to a poor or unanticipated result." Morlino v. Med. Ctr. of Ocean County, 152 N.J. 563, 584, 706 A.2d 721 (1998). Whether a defendant doctor "has committed an act of malpractice depends not on the outcome, but on whether the doctor adhered to the applicable standard of care." Ibid. These principles are reflected in Model Jury Charge (Civil) 5.50A, which states in part that whether a defendant doctor "was negligent depends not on the outcome, but on whether [defendant] adhered to or departed from the applicable standard of care."
Therefore, a jury should not be instructed that it may infer that a defendant doctor was negligent on the basis of a poor or unanticipated result, unless it is common knowledge that the injury would not have occurred in the absence of negligence, or the plaintiff presents expert testimony that meets the requirements of Buckelew. Because the common knowledge principle does not apply here, and plaintiff's experts failed to provide evidential support for their assertion that the medical community recognizes that plaintiff's injury would not have occurred in the absence of negligence, the trial judge correctly denied plaintiff's request for a res ipsa loquitur charge.
In further support of his contention that the judge should have charged the jury on res ipsa loquitur, plaintiff relies upon Dr. Singh's testimony that if he hit plaintiff's nerve root and damaged it during the procedure, that would be malpractice. Dr. Singh agreed that the standard of care required that he avoid hitting the nerve root when performing the procedure. He also agreed that it would be malpractice to cause thermal damage to the nerve root during the procedure.
However, Dr. Singh never conceded that he damaged plaintiff's nerve root when he performed the procedure. Indeed, his expert maintained that plaintiff's nerve was compromised before the surgery and opined that, even though the procedure was performed in accordance with the accepted standard of care, plaintiff's nerve apparently was injured as a result of an irritation or reaction to the heating of the disc material.
Thus, Dr. Singh did not concede that plaintiff's nerve would not have been injured in the absence of negligence. Dr. Singh also did not concede that it was more probable than not that plaintiff's injury was caused by his negligence. In our view, Dr. Singh's testimony did not provide a basis for the res ipsa loquitur charge.
In his dissenting opinion, Judge Winkelstein maintains that a conditional res ipsa *997 loquitur charge was required in this case because the experts generally agreed that if defendant touched or burned plaintiff's nerve during the radiofrequency procedure, that would be a deviation from the applicable standard of care. Defendant also testified that if he hit or overheated the nerve root and damaged it during the procedure, that would be malpractice. Although the experts and defendant may have agreed that it would be malpractice to touch or burn the nerve during the radiofrequency procedure, this is not the same as saying that the medical community recognizes that plaintiff's injury would not have occurred in the absence of negligence.
Judge Winkelstein also maintains that because the res ipsa loquitur doctrine applied to plaintiff's version of the accident, a conditional res ipsa loquitur charge was required in this case. However, as we have explained, the doctrine does not apply in a medical malpractice case unless it is common knowledge that the injury would not have occurred in the absence of negligence, or the plaintiff presents expert testimony that meets the criteria established by Buckelew.
As we pointed out previously, Dr. Weisband's assertion that the medical community recognizes that an injury of the sort sustained here would not have occurred in the absence of negligence was not supported by any medical text. Furthermore, Dr. Weisband has no personal experience in performing the procedure and therefore could not testify that negligence is the most frequent cause of the injury sustained by plaintiff. Dr. Weisband's opinion regarding that the medical community's view as to the cause of plaintiff's injury was based on nothing other than his "intuitive feeling." Buckelew, supra, 87 N.J. at 529, 435 A.2d 1150.
The same applies to Dr. Brait's testimony. Dr. Brait testified that he never performed a radiofrequency procedure and, while he may have researched the medical literature in reaching his opinions that defendant deviated from the standard of care by performing the procedure and performing it improperly, he failed to point to any medical text which supports his assertion that the medical community recognizes that the injury at issue would not have occurred in the absence of negligence. Dr. Brait's opinion regarding the medical community's view of the cause of the injury was nothing but a "flat out statement" designed solely to lay a foundation for a res ipsa loquitur charge. Ibid. We are convinced that Buckelew requires more.
Therefore, we conclude that the trial judge did not err by refusing to charge the jury on res ipsa loquitur.

III.
Plaintiff next argues that the judge erred by failing to declare a mistrial after Dr. Singh testified that disc material can cause a "chemical burn" if it comes in contact with a nerve.
At trial, Dr. Singh was asked to explain generally how he treats patients with back pain and disc problems. Dr. Singh explained that there are various sources of pain in the spine. He stated that an epidural injection helps most of these sources of pain. Dr. Singh testified that:
the most important thing for herniated disc patients is we use salt solution which is called hypertonic saline. . . . It's basically salt water. . . .
And, what salt water does is it pulls the water . . . and in there a few chemicals which are very important. As long as they're inside, it allows us to bend, move. Now, when these chemicals leak out, that's when it's called herniation.

*998 And, when it comes out, it is basically a jelly type of substance. And, it's a chemical process. There's chemical inflammation. It just works exactly like if we have a hot pepper which is present in hot sauce. If [it] accidentally goes into [the] eye, it'll cause [a] problem. But, as long as it's not in the eye, it's in hand, it might be okay.
So, same way [with] this jelly  as long as [it] stays inside, it's beautiful. It's doing its perfect job, and we can bend, and we can do all things. But, when it leaks out, it causes chemical burn. And when there is [a] herniation . . .
At this point, plaintiff's attorney objected and the judge sustained the objection.
Plaintiff's counsel then moved for a mistrial, arguing that Dr. Singh had testified in his deposition that he did not know the cause of plaintiff's nerve injury and at no point did Dr. Singh ever suggest that "chemical burn" was the cause of the injury. In response, defendants' attorney pointed out that in his deposition, Dr. Singh had mentioned chemical irritation and inflammation when discussing the possible causes of back pain. Counsel also pointed out that in his trial testimony, the doctor had been speaking generally and he was not specifically addressing the cause of plaintiff's injury.
The judge found that Dr. Singh's reference to a "chemical burn" was a surprise to plaintiff's counsel because the doctor had not used that expression in his deposition. The judge determined that a mistrial was not required but gave the jury the following instruction:
Yesterday, the defendant, Dr. Sunil Singh, made a claim before you which is totally inadmissible and not supported by the facts and evidence in this case, and must be completely disregarded by you.
Dr. Singh claimed that when . . . disc material from inside a herniated disc comes outside the disc, . . . it caused a chemical burn. Now, you are to disregard the testimony regarding the . . . alleged chemical burn as Dr. Singh has testified to. You're to disregard that.
In addition, the judge allowed Dr. Weisband to be called as a rebuttal witness. Dr. Weisband testified that he has been treating patients with back problems for over thirty years. He stated that he has removed herniated discs and, in doing so, extracted disc material. Dr. Weisband asserted that during the procedure, the disc material "often rubs right against the nerve root." He said that he had never "seen a chemical reaction that has caused a burn to the nerve."
The Supreme Court has recognized that during a trial, inadmissible evidence may come to the attention of the jury. State v. Winter, 96 N.J. 640, 646, 477 A.2d 323 (1984). However, a mistrial is not required in every case when this occurs.
The decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial, is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting.
[Id. at 646-47, 477 A.2d 323.]
A decision by the trial court to deny a motion for a mistrial "`is reviewable only for an abuse of discretion.'" Id. at 647, 477 A.2d 323 (quoting State v. Witte, 13 N.J. 598, 611, 100 A.2d 754 (1953)). "Likewise, when weighing the effectiveness of curative instructions, a reviewing court *999 should give equal deference to the determination of the trial court." Ibid.
We are satisfied that the trial judge did not abuse his discretion by denying plaintiff's motion for a mistrial. Although Dr. Singh did not specifically state that plaintiff's nerve was damaged by a "chemical burn," the jury could have interpreted his statement in that manner. Therefore, the judge did not err by finding that plaintiff was surprised by Dr. Singh's statement. Nevertheless, we are convinced that the measures taken by the judge were sufficient to cure any potential for prejudice that could result from Dr. Singh's statement.
In support of his contention that a mistrial should have been ordered here, plaintiff relies upon McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 771 A.2d 1153 (2001). In that case, the plaintiff brought a wrongful birth action, alleging that the defendant doctors were negligent in reading a sonogram that showed birth defects and but for the defendants' negligence, the plaintiff would have terminated the pregnancy. Id. at 364, 771 A.2d 1153. The plaintiff alleged that she had a two-week period after the sonogram in which to have a legal abortion. Id. at 366-67, 771 A.2d 1153.
At trial, one of the defendants testified that he did not review the sonogram until two weeks after the test. Ibid. The defendant had testified at his deposition that he reviewed the sonogram at the time it was taken. Ibid. In addition, the sonographer testified at her deposition that she did not notice any defect on the test, and did not make a notation that the doctor should follow up on the sonogram. Id. at 367, 771 A.2d 1153. However, at trial, the sonographer said that she did notice a possible defect and made the notation. Ibid.
The jury in McKenney found that the defendant doctor was negligent but also found that the negligence occurred after the time when plaintiff could have legally terminated the pregnancy. Id. at 368-69, 771 A.2d 1153. The jury therefore determined that the defendant's negligence was not a proximate cause of plaintiff's harm. Ibid. The Supreme Court held that the "surprise testimony had the clear capacity to influence the jury's decision on proximate cause." Id. at 375, 771 A.2d 1153. The defendant's trial testimony "clearly prejudiced" the plaintiff. Ibid. The Court concluded that the trial court abused its discretion by failing to grant a mistrial. Id. at 376, 771 A.2d 1153.
We are satisfied that plaintiff's reliance upon McKenney is misplaced. In McKenney, the verdict indicated that the jurors had based their decision on the improper surprise trial testimony. Moreover, in McKenney, the trial court did not take any steps to address the surprise testimony. By contrast, in this case, the jury was instructed to disregard the evidence and plaintiff was permitted to offer rebuttal evidence on the issue. Under these circumstances, Dr. Singh's statement did not have a clear capacity to influence the jury's decision. Therefore, McKenney does not require reversal of the judgment under review.

IV.
Finally, plaintiff argues that the judge erred by denying his motion for a new trial or for judgment notwithstanding the verdict. Plaintiff contends that the judge should have charged the jury on res ipsa loquitur. Plaintiff additionally contends that the verdict was against the weight of the evidence.
However, as we have determined, the judge's refusal to charge the jury on res ipsa loquitur was not erroneous. *1000 Moreover, there was sufficient evidence to support the jury's finding that Dr. Singh did not deviate from the applicable standard of care in his treatment of plaintiff. Here, the jury apparently chose to accept the testimony of Dr. Singh and his expert, and reject the expert testimony presented by Dr. Weisband and Dr. Brait. We are convinced that the trial judge did not err by finding that plaintiff failed to establish that the jury's verdict was a miscarriage of justice under the law. R. 4:49-1(a).
Affirmed.
WINKELSTEIN, J.A.D., dissenting.
Because I conclude that the trial judge's refusal to provide the jury with a res ipsa loquitur charge was a mistaken exercise of discretion that brought about an unjust result, I respectfully dissent.

I.
After suffering from back pain for a number of years, plaintiff consulted an orthopedic surgeon who recommended surgery to remove a herniated disc fragment from plaintiff's spine. Defendant, a neurologist, instead recommended less invasive measures, but when those failed to provide plaintiff with relief from his pain, defendant recommended the use of a radiofrequency needle to heat the disc and shrink the disc material to relieve pressure on the nerve root.[5] Plaintiff agreed, and defendant performed the procedure. Though the operative report defendant signed states that he performed laser surgery, he testified that he performed radiofrequency surgery, as he had described to plaintiff, and that the report was a mistake in record keeping.
The effects the operation had on plaintiff were disputed. Defendant testified that following the procedure, plaintiff did not exhibit immediate signs of traumatic nerve injury. Plaintiff had a different recollection; he testified he could not use his left foot "right after" the operation.
Plaintiff's expert, Dr. I. David Weisband, an orthopedic surgeon, testified that a post-operative MRI was essentially unchanged from a pre-operative MRI. Defendant's expert, Dr. Ratner, also an orthopedic surgeon, testified that he expected the MRI to look the same after the radiofrequency procedure because the procedure was not designed to remove the disc fragment or protrusion, but rather to shrink the area and help the tissue heal.
On June 22, 2000, plaintiff consulted a neurosurgeon and underwent needle electromyography (EMG) to determine the cause of his post-operative foot drop. The EMG showed complete damage to his L5 nerve root. He consulted a specialist in spinal diagnostics, Dr. Gregory M. Braccia, who suggested that the foot drop was "consistent with the thermal injury to the L5 nerve root with radiculopathy." By that time, plaintiff had lost significant use of his left leg.
At trial, the expert testimony conflicted about whether plaintiff had an "extruded fragment"  a "free piece of dis[c]" outside the disc space  and whether performing the procedure in light of an extruded disc fragment was contrary to the standard of care. Dr. Weisband testified that defendant's report noted an "extruded fragment at L4-5." Dr. Ratner acknowledged that plaintiff "probably had a small piece of dis[c] fragment which had come through the wall of the dis[c] and was lying free in the epidural space." Defendant, on the other hand, testified that there was no extruded fragment on the L4-5 disc at all, but rather the reference to an extruded *1001 fragment was a printing error on his report.
Dr. Weisband and plaintiff's other expert, Dr. Kenneth Brait, a neurologist, each testified that the procedure defendant conducted should never be done to a patient with an extruded fragment. Dr. Weisband said that when the disc is extruded, the procedure could cause permanent damage to the patient by burning the nerve. Dr. Brait testified that the procedure should not be done to someone, like plaintiff, with a history of nerve damage.
Dr. Ratner testified that the medical literature advised against the procedure when the patient had an extruded or large herniated disc, not because it could harm the patient, but because the patient would have a reduced chance of improvement under those circumstances. He asserted that in using this procedure on plaintiff, defendant made a "judgment call" that was proper and reasonable under the standard of care. Defendant denied that the procedure should not be done in cases where a patient has an extruded or herniated disc.
Dr. Weisband testified that when one inserts a thermal probe into a disc with a hole in it, as is the case where a disc fragment extrudes, the probe can burn the nerve root in the area of the hole. He testified that plaintiff's L5 nerve root had been "burnt and destroyed;" he agreed with Dr. Braccia's report that there was "thermal injury" to that nerve root. He told the jury that it is contrary to the standard of care to perform the procedure with an extruded fragment, and it is malpractice to burn the nerve root during the surgery.
Dr. Brait testified that plaintiff's nerve damage could only be caused if the procedure was not done correctly; that his injury would not have occurred had defendant performed it properly. He also concluded that plaintiff's foot drop was caused by a thermal injury to the nerve root during surgery.
Dr. Ratner agreed that performing the procedure in such a way as to touch, manipulate, overheat or cause thermal damage to the nerve root deviates from the standard of care. Defendant also agreed that hitting, overheating, or causing thermal damage to the nerve root during the procedure would be malpractice. Both Dr. Ratner and defendant testified, however, that defendant did not burn or touch the nerve root.

II.
Plaintiff claims he was entitled to a res ipsa loquitur charge. He asserts that the charge was required because his experts testified that the injury would not have occurred without defendant's negligence, and that all the experts, including defendant's expert, Dr. Ratner, as well as defendant himself, agreed that it would have been negligent for defendant to touch or heat the L5 nerve root during the procedure. Defense counsel argued to the trial court, and has reiterated on appeal, that no res ipsa loquitur charge was warranted because both defendant and his expert testified that the procedure was properly performed, raising disputed issues of fact. The trial judge agreed with defense counsel's argument and declined to provide the jury with a res ipsa loquitur charge.
Negligence must generally be proved and is not presumed. Buckelew v. Grossbard, 87 N.J. 512, 525, 435 A.2d 1150 (1981). Res ipsa loquitur allows an inference of negligence under certain circumstances. Ibid.
The maxim res ipsa loquitur symbolizes a permissible presumption of negligence from the plaintiff's proof, . . . an allowable inference of the defendant's want of due care where (a) the occurrence *1002 itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect.
[Bornstein v. Metro. Bottling Co., 26 N.J. 263, 269, 139 A.2d 404 (1958).]
It is the first prong of the test that is at issue here, whether a finding of fact that the nerve was burned during the procedure would bespeak negligence.
The res ipsa loquitur doctrine establishes a "prima facie case by permitting the jury to infer negligence." Buckelew, supra, 87 N.J. at 526, 435 A.2d 1150. The doctrine may apply in a medical malpractice case. Sanzari v. Rosenfeld, 34 N.J. 128, 140, 167 A.2d 625 (1961). Typically, it is applicable in medical malpractice cases that implicate the jurors' common knowledge. Buckelew, supra, 87 N.J. at 527, 435 A.2d 1150. Under some circumstances, however, it may be warranted in the absence of common knowledge, by the use of expert testimony. "[E]xpert testimony to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence may afford a sufficient basis for the application of the doctrine of res ipsa loquitur." Ibid. In such a case, the expert's opinion may be "read as forming an integral part of the foundation for the rule of res ipsa loquitur." Id. at 525, 435 A.2d 1150.
When it is the expert's opinion, rather than the jurors' common knowledge, that forms the basis for a res ipsa loquitur charge, the opinion must constitute more than just the "expert's intuitive feeling." Id. at 529, 435 A.2d 1150. The expert may not "slavishly" follow a "`common-knowledge-within-the-medical-community' formula." Id. at 528-29, 435 A.2d 1150. "There must be some evidential support, experiential or the like, offered for the expert's conclusion that the medical community recognized that the mishap in question would not have occurred but for the physician's negligence." Id. at 529, 435 A.2d 1150.
The doctrine of res ipsa loquitur may also be applicable where facts are contested.
If the evidence presents a factual issue as to how an accident occurred, and the res ipsa loquitur doctrine would be applicable under only one version of the accident, the court should give a "conditional" res ipsa loquitur instruction, under which the jury is directed first to decide how the accident happened and to consider res ipsa loquitur only if it finds that the accident occurred in a manner which fits the doctrine.
[Allendorf v. Kaiserman Enters., 266 N.J.Super. 662, 669, 630 A.2d 402 (App. Div.1993); see also Roper v. Blumenfeld, 309 N.J.Super. 219, 232, 706 A.2d 1151 (App.Div.) (standing for the same proposition in a dental malpractice setting), certif. denied, 156 N.J. 379, 718 A.2d 1208 (1998).]
Under the facts here, a conditional res ipsa loquitur charge was required. The experts, as well as defendant himself, testified that if defendant burned or touched plaintiff's nerve during the operative procedure, he would have deviated from the standard of care. Dr. Weisband testified that if the procedure is done properly, the nerve can never be burned; the only way to burn the nerve during the procedure is to violate the standard of care. He testified that his opinion was consistent with generally accepted principles within the medical community.
Dr. Brait agreed. He testified that it was generally recognized in the medical *1003 community that touching or heating the nerve was a violation of the standard of care. In other words, he asserted that plaintiff's L5 nerve root would not have been burned in the absence of defendant's negligence.
Dr. Ratner also agreed that if defendant "touched or manipulated the nerve root in a way that caused damage to it," he would have deviated from the standard of care. He conceded on cross-examination that the procedure was "not supposed to be anywhere near" the nerve. He agreed with plaintiff's counsel that "it would be a deviation of the standard of care if the defendant performed this procedure in a way that caused thermal damage to the nerve root."
Defendant also agreed that hitting or damaging the nerve root during the procedure would be malpractice. He testified that the standard of care required that he avoid hitting the nerve root while performing the procedure; that if he overheated the nerve root, causing thermal damage during the procedure, he would have committed malpractice. Indeed, when he was asked by plaintiff's counsel on cross-examination if he agreed that if he overheated the nerve root to the point where there was complete radiculopathy, his conduct would violate the standard of care, defendant replied: "If somebody did, that person has to be drunk to do it."
Thus, all of the experts agreed that it would have been a violation of the standard of care for defendant to burn plaintiff's nerve during the procedure. The disputed fact was whether defendant did burn the nerve. Given this evidence, the jurors should have first been instructed to decide whether defendant burned plaintiff's nerve root in performing the procedure on plaintiff. If the jury determined defendant did so, it should then have been instructed on the elements of res ipsa loquitur.[6] If the jury determined that in performing the procedure defendant did not burn plaintiff's nerve root, the doctrine of res ipsa loquitur would have been inapplicable.
The failure to charge res ipsa loquitur here is similar to the failure to do so in Roper, supra, 309 N.J.Super. 219, 706 A.2d 1151. There, the plaintiff sued the defendant dentist for allegedly damaging a nerve during a tooth extraction. Id. at 223-25, 706 A.2d 1151. The plaintiff's expert testified that in his opinion the defendant deviated from the standard of care because permanent damage to that particular nerve is not an "expected [or] anticipated" result of the extraction. Id. at 226, 706 A.2d 1151. As a result of the procedure performed by the defendant, the plaintiff went to an oral surgeon, who removed the extracted tooth's residual root from the bone. Id. at 224-25, 706 A.2d 1151. The defendant's expert testified that the defendant did not stray from the accepted standard of care, and that the nerve injury occurred during the second surgery. Id. at 227, 706 A.2d 1151. The case hinged upon a factual issue as to when the plaintiff began to experience numbness, which was a sign of injury to the nerve. Id. at 224, 706 A.2d 1151. We held that the jury should have been told that if it believed the plaintiff's numbness began after the first procedure, and if it believed that risk to the injured nerve was not a normal risk inherent in the procedure, then it would have been permitted to infer that the defendant was more likely than not negligent. Id. at 234, 706 A.2d 1151.
*1004 As in Roper, a conditional res ipsa loquitur instruction was required here. The parties' experts presented opposing factual scenarios as to how plaintiff's nerve damage occurred. Plaintiff's experts asserted that defendant burned plaintiff's nerve during the procedure; defendant and his expert disputed that defendant burned plaintiff's nerve. Yet all of the experts, including defendant, admitted that if during the procedure defendant did burn plaintiff's nerve, he would have deviated from the standard of care. Thus, if the jury found that defendant burned plaintiff's nerve, it could have inferred that defendant was negligent. If it did not believe that happened, no such charge was warranted.
The majority asserts that the doctrine of res ipsa loquitur is not applicable here because neither Dr. Weisband nor Dr. Brait provided the appropriate foundation to support their opinions that the medical community recognizes that burning the nerve does not ordinarily occur in the absence of negligence. I disagree with the majority's conclusion for two reasons. First, plaintiff's experts did not put forth a novel theory of causation. There was no dispute among the experts, or by defendant, that to burn the nerve during the procedure was a deviation from the standard of care. Under those circumstances, no additional foundation or evidential support for plaintiff's experts' opinions was necessary.
Second, even if additional foundation for the experts' opinions was needed, a fair reading of the record shows that plaintiff's experts' opinions were based on more than just their own "intuitive feelings." See Buckelew, supra, 87 N.J. at 528-29, 435 A.2d 1150. On voir dire, Dr. Weisband testified that his opinions were based on medical literature, including orthopedic textbooks and medical internet sites that he personally reviewed. He also consulted a colleague, an orthopedic specialist and medical school instructor. While he had never personally performed the procedure at issue, he performed "very similar" procedures, and he had over twenty years of experience doing spinal surgery. In fact, when the court qualified Dr. Weisband as an expert, it observed that he "had opportunity to research and . . . [investigate] and educate himself with respect to [the] procedures."
Dr. Brait also relied on more than his own gut feeling. He had been a neurologist for "twenty some odd years" in the Philadelphia/New Jersey area. Though he personally had never performed the procedure at issue, he had researched the medical literature, which he testified assisted him in formulating his opinions.
The opinions were also supported by the facts of the case. Dr. Weisband had examined plaintiff; he provided explanations of his reading of the pre- and post-operative MRIs, and he explained why he reached the same conclusion as did Dr. Braccia, that plaintiff experienced a thermal nerve injury. He explained the radiofrequency procedure to the jury and gave reasons why, in his opinion, it resulted in the burning of plaintiff's nerve. He testified as to why the procedure should not have been done when plaintiff had a free disc fragment.
Dr. Brait testified as to the mechanics of the radiofrequency procedure; he noted that proper performance of the procedure takes place inside the disc, though the damaged nerve root exists outside the disc. He also testified as to why he believed the nerve injury was the result of a thermal injury during surgery.
In sum, plaintiff's experts' opinions are more than simply "net opinions" based on their own intuitive feelings. Neither expert "slavishly" followed the "common-knowledge-within-the-medical-community" *1005 formula that the Buckelew court cautioned against. Buckelew, supra, 87 N.J. at 528-29, 435 A.2d 1150. They formed their opinions from the facts of the case and the medical literature.
"[A]n expert in a malpractice action need not have had personal experience with the situation under investigation to testify to the applicable standard of care. His knowledge may derive from observations of the methods used by members of the profession or from his study of professional treatises and journals." Sanzari, supra, 34 N.J. at 137, 167 A.2d 625. Such is the case here. The evidence falls squarely within the holding in Buckelew, supra, that "expert testimony to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence may afford a sufficient basis for the application of the doctrine of res ipsa loquitur." 87 N.J. at 527, 435 A.2d 1150.

III.
For these reasons, I conclude that plaintiff was entitled to a conditional res ipsa loquitur instruction. The failure to charge res ipsa loquitur, when applicable, constitutes reversible error. Vespe v. DiMarco, 43 N.J. 430, 439, 204 A.2d 874 (1964); Roper, supra, 309 N.J.Super. at 233, 706 A.2d 1151; Terrell v. Lincoln Motel, Inc., 183 N.J.Super. 55, 59, 443 A.2d 236 (App. Div.1982). Consequently, I would vacate the final judgment in favor of defendant and remand for a new trial.
NOTES
[1] Plaintiff also named Trimedyne, Inc. as a defendant. It appears that at some point, the claims against Trimedyne were dismissed. In addition, plaintiff's wife asserted a claim for the loss of her husband's support, society, and consortium.
[2] "Antalgic gait" is a limb "in which a phase of the gait is shortened on the injured side to alleviate the pain experienced when bearing weight on that side." The American Heritage Stedman's Medical Dictionary, 50 (1995).
[3] "Foot drop" is a "paralysis or weakness of the dorsiflexor muscles of the foot and ankle, resulting in dragging of the foot and toes." Id. at 312.
[4] "Radiculopathy" is a disease of the spinal nerve roots. Id. at 702.
[5] The parties and witnesses use the terms "nerve" and "nerve root" interchangeably.
[6] I do not address, as it has not been raised, whether plaintiff would have been entitled to a directed verdict on the violation of the standard of care if the jury found that defendant burned plaintiff's nerve during the procedure. See R. 4:40-1.