975 A.2d 389

MOHAMMED KHAN AND TASMIH KHAN, HIS WIFE, PLAIN-
TIFFS–APPELLANTS, v. SUNIL K. SINGH, M.D.; MINIMALLY
INVASIVE SURGERY CENTER; INTERVENTIONAL NEU-
ROLOGY, HEADACHE & PAIN RELIEF CENTER, DEFEN-
DANTS–RESPONDENTS, AND TRIMEDYNE, INC., DEFEN-
DANT.

Argued March 24, 2009—Decided July 9, 2009.

*Kenneth G. Andres, Jr.,* argued the cause for appellants (*Andres & Berger,* attorneys; *Mr. Andres* and *Tommie Ann Gibney,* on the brief).

*Thomas B. Reynolds* argued the cause for respondents (*Reynolds & Drake,* attorneys; *Mr. Reynolds, John J. Bannan,* and *Maria Saveria Bilotti,* on the briefs).

*Abbott S. Brown* and *William L. Gold* submitted a brief on behalf of *amicus curiae* New Jersey Association for Justice (*Bendit Weinstock,* attorneys).

Justice HOENS delivered the opinion of the Court.

This matter, which is before the Court as of right based on the dissent filed in the Appellate Division, *see N.J. Const.* art. VI, §5, ¶ 1(b); *R.* 2:2–1(a)(2), presents the Court with the opportunity to consider the contours of the doctrine of *res ipsa loquitur.* More specifically, it presents this Court with two questions about the appropriate application of that doctrine in the context of medical malpractice litigation.

First, we are called upon to define the qualifications needed for an expert to testify that it is common knowledge in the medical community that an occurrence does not ordinarily happen in the absence of negligence. Second, we are presented with the opportunity to consider the "conditional *res ipsa loquitur*" theory devised, and occasionally employed, by our Appellate Division.

In the final analysis, based on our response to the first question, the verdict in this matter cannot successfully be challenged, and we affirm it. Although we therefore leave for another day a determination of the second question, we nonetheless consider it briefly in order to express our concerns about its viability in the medical malpractice context.

I.

The facts that are relevant to the issues before the Court can be summarized briefly. Plaintiff Mohammed Khan began experienc-

ing lower back pain as early as 1983 and was treated for that pain from its onset until 1992. After the pain increased, he consulted with Dr. Joseph Zerbo, a board-certified orthopedic surgeon, in October 1999. Dr. Zerbo examined plaintiff and described his condition as "mild discomfort in the lower back." Significant to the issues raised on appeal, Dr. Zerbo also noted that plaintiff was suffering from a condition he identified as "an acute footdrop on the left." He diagnosed plaintiff as suffering from "lumbar radiculopathy, most likely secondary to [a] . . . disc herniation." An MRI performed at the time revealed a "disc protrusion at L4–L5," "degenerative disc disease," and an "annular tear." Dr. Zerbo recommended that plaintiff have surgery to remedy these conditions.

Because plaintiff wanted a second opinion before agreeing to have surgery, he consulted defendant Dr. Sunil Singh, who is board-certified in internal medicine, neurology, and pain medicine. Following his evaluation of plaintiff's history and condition, defendant suggested a different approach, consisting of medication, traction therapy, physical therapy, and epidural injections. When that conservative course of treatment did not provide plaintiff with complete relief, defendant recommended that plaintiff undergo a thermal energy discectomy. That procedure is designed to use heat energy to shrink a bulging herniated disc, with the goal of reducing the pressure exerted by the disc on the nerve root, thereby alleviating the pain.

Plaintiff agreed with this recommendation and defendant performed the procedure on May 10, 2000. According to defendant, he first inserted dye into the affected disc, a procedure called a discogram. The manner in which the dye spread demonstrated to defendant that there was a tear in the lining of the disc, but that there was no extruded disc fragment at the L4–L5 level.

Defendant then inserted a thin radiofrequency needle into the disc, to heat its contents so that it would contract and relieve the pressure on the nerve root. Defendant testified that he performed the procedure properly, and he specifically denied striking,

touching, or burning the nerve root with the radiofrequency probe. Defendant's discharge note reported that plaintiff experienced no immediate complications during or after the procedure and that he "was ambulating well," moving with a "steady gait," and suffered "no new motor deficits."

Plaintiff's recollection was different from the observations recorded in defendant's discharge note. He asserted that when he awoke from the procedure, he immediately experienced a foot drop, that his left leg felt "extremely heavy," and that he had difficulty walking because his "feet [did not] work." Plaintiff contended that he complained to members of defendant's staff, who attributed his complaints to the aftereffects of the anesthesia.

Plaintiff also testified that within a few days after the procedure his pain became increasingly worse, to the point of being "severe" and "intolerable." At that point, he told defendant that he was in extreme pain and that he could not move his foot. Defendant testified that it was on that date that he first noticed that plaintiff was exhibiting a foot drop.

A post-operative electromyography (EMG) revealed that plaintiff's L5 nerve root was completely destroyed. Thereafter, plaintiff commenced this action, alleging that defendant negligently performed the radiofrequency procedure and burned his L5 nerve root, causing his injuries.

Three experts testified at trial, two providing expert opinions on behalf of plaintiff and the third testifying for defendant. Their testimony presented the jury with different explanations about how plaintiff's injuries could have been caused.

Plaintiff's first expert, a board-certified orthopedic surgeon, was Dr. I. David Weisband. He testified that the radiofrequency procedure used by defendant was contraindicated because the discogram showed that there was an extruded fragment of the L4–L5 disc. He opined that in that circumstance, the radiofrequency procedure presents a risk of permanently burning the nerve root because it permits heat to travel outside the disc to the herniated

disc material. In Dr. Weisband's view, therefore, defendant should not have performed the procedure at all and deviated from the standard of care by doing it. Dr. Weisband also opined that the L5 nerve root in fact was burned and consequently destroyed during the radiofrequency procedure, and that it was the cause of plaintiff's foot drop. Finally, although conceding that he had never performed nor been trained to perform the radiofrequency procedure itself, he asserted that the medical community generally recognizes that such an injury, that is, the burning of the nerve root, does not ordinarily occur in the absence of negligence. He commented that the "only way" one could burn the nerve root was through negligence.

Dr. Kenneth Brait, a board-certified neurologist, also testified on plaintiff's behalf. Like Dr. Weisband, Dr. Brait testified that the radiofrequency procedure was contraindicated for several reasons, including the presence of an extruded disc fragment. Like Dr. Weisband, he had not been trained on the procedure and had never performed it. He too, however, opined that defendant deviated from the applicable standard of care and injured plaintiff by burning the nerve root during the procedure. He based his opinion, in part, on the fact that the post-operative EMG demonstrated that plaintiff's nerve root was completely destroyed, a condition he attributed to negligence in performing the procedure. Dr. Brait also testified that the type of injury plaintiff suffered typically does not occur in the absence of negligence, commenting that, based on his review of the literature, if the procedure is properly performed, it does not cause the nerve to be heated. Although he conceded that the destruction of the nerve root ordinarily should result in an immediate foot drop, he suggested that it was possible that the effect was delayed because thermal injuries tend to worsen over time.

Defendant called Dr. Irving Ratner, a board-certified orthopedic surgeon, as his expert. Like the other experts, he had not been trained to perform the radiofrequency procedure; however, his testimony demonstrated that he was familiar with medical litera-

ture regarding the procedure that defendant utilized. Dr. Ratner testified that the radiofrequency procedure was not contraindicated. Although conceding that the medical literature advises against conducting the procedure when an extruded fragment is present, he explained that this is not because the procedure poses a risk of injury to the patient, but because "the rate of improvement is lower in that type of case." In Dr. Ratner's opinion, therefore, defendant's decision to perform the procedure was appropriate.

Moreover, Dr. Ratner testified that, in performing the procedure, defendant complied with the applicable standard of care. He opined that defendant did not burn the nerve root during the procedure, instead asserting that plaintiff had a pre-existing medical condition that worsened because of normal chemical changes in the body following the procedure. That is, Dr. Ratner contended that plaintiff had a "sick nerve root" that had previously caused him to suffer "sensory deficit" and "radiating leg pain" and had resulted in an episode of foot drop that Dr. Zerbo had observed. He explained that even if those effects were transient, they demonstrated that "[t]he nerve root [that plaintiff] brought to [defendant] was already partially damaged and probably the result of his long-standing disc disease." In Dr. Ratner's opinion, any surgery, manipulation, or invasive procedure in the area of that nerve could have caused swelling or irritation that would result in a chemical reaction that could cause the nerve, in essence, to shut down.

Dr. Ratner also testified that there was no evidence that defendant deviated from the standard of care by burning the nerve root during the procedure. He supported his opinion by explaining that if defendant had burned or injured the nerve root, plaintiff would have "jumped or jerked or moaned or screamed" because he was not under general anesthesia during the procedure and therefore would have felt it if the root were burned. Similarly, in his opinion, plaintiff would have experienced "immediate severe pain and loss of function" after the procedure if defendant

had burned the nerve root. Dr. Ratner concluded that because plaintiff did not experience any such immediate effect, defendant could not have burned the nerve root during the procedure. Like plaintiff's two experts, both defendant and Dr. Ratner agreed that striking or burning the nerve root during the procedure would represent a deviation from the standard of care.

## II.

At the close of the evidence at trial, plaintiff requested that the court include a *res ipsa loquitur* charge in the jury instructions. In support of that request, plaintiff asserted that the experts had testified that "this injury would not have occurred during this surgical procedure absent negligence."

Defendant disagreed, pointing out that although all of the physicians testified that burning the nerve root during the procedure would be a deviation from the standard of care, his expert had explained that the same injury could have occurred in the absence of any negligence, thus making the *res ipsa* charge inappropriate. The trial court, based on its evaluation of the testimony and the evidence, agreed with defendant.

After the jury returned its verdict in favor of defendant based on its unanimous finding that defendant had not deviated from the accepted standard of medical care, plaintiff moved for a new trial or for judgment notwithstanding the verdict. In denying that relief, the trial court reiterated its decision rejecting the requested *res ipsa* charge.

The Appellate Division affirmed in a published opinion with one judge dissenting. *Khan v. Singh,* 397 *N.J.Super.* 184, 936 *A.*2d 987 (App.Div.2007). The majority concluded that plaintiff was not entitled to the *res ipsa* charge, *id.* at 194, 936 *A.*2d 987, because plaintiff had failed to demonstrate that it is generally accepted in the medical community that the injury would not have occurred if the procedure had been performed in accordance with the standard of care, *id.* at 196, 936 *A.*2d 987. In part, the majority reached that conclusion because, in its view, plaintiff's experts

lacked the qualifications necessary to demonstrate that there was a general agreement in the medical community that the injury would not have occurred in the absence of negligence and failed to point to any support for their opinions to that effect. *Id.* at 197–99, 936 *A.*2d 987.

Instead, the majority noted that the parties had presented different theories about how the injury had occurred, only one of which would have been the result of negligence, thus making a *res ipsa* charge inappropriate. *Id.* at 200–01, 936 *A.*2d 987. The majority also considered, and rejected, plaintiff's argument that a "conditional *res ipsa* charge" should have been given.

In addition to setting forth the reasons for finding the doctrine inapplicable, the majority commented that although the experts "may have agreed that it would be malpractice to touch or burn the nerve root during the radiofrequency procedure, th[at] is not the same as saying that the medical community recognizes that plaintiff's injury would not have occurred in the absence of negligence." *Id.* at 200, 936 *A.*2d 987.

The dissenting judge contended that the trial court should have included a conditional *res ipsa* charge. *Id.* at 209, 936 *A.*2d 987 (Winkelstein, J.A.D., dissenting). In his view, because all of the experts agreed that burning the nerve root during the procedure would be negligent, the jury should have been instructed to first decide the factual dispute about whether defendant in fact burned the nerve root during the procedure and then, if it decided that dispute in plaintiff's favor, it should have been instructed that the *res ipsa* doctrine would permit an inference of negligence. *Id.* at 210, 936 *A.*2d 987. In reaching that conclusion, the dissenting judge noted that, in this trial, there was a sufficient foundation for a *res ipsa* charge because all of the experts agreed that burning the nerve root during the procedure would have been a deviation from the standard of care. *Id.* at 211, 936 *A.*2d 987.

Plaintiff's petition for certification of issues other than the dispute about the *res ipsa* charge was denied. 197 *N.J.* 15, 960 *A.*2d 744 (2009). As a result, the only issue before us is the

propriety of the trial court's decision, affirmed by the majority but urged as erroneous by the dissent, declining to include the *res ipsa* instruction in the charge to the jury.

### III.

We have long held that it is ordinarily a plaintiff's burden to prove negligence, and that it is never presumed. *Hansen v. Eagle–Picher Lead Co.*, 8 *N.J.* 133, 139, 84 *A.*2d 281 (1951). Even so, we have also long recognized that there is a place in our system of justice for the *res ipsa loquitur* doctrine. *See Bornstein v. Metro. Bottling Co.*, 26 *N.J.* 263, 269–70, 139 *A.*2d 404 (1958) (citing cases and authorities). The theory, which can be translated from Latin as the maxim "the thing speaks for itself," permits the jury to infer negligence in certain circumstances, effectively reducing the plaintiff's burden of persuasion, but not shifting the burden of proof. *Eaton v. Eaton*, 119 *N.J.* 628, 638, 575 *A.*2d 858 (1990).

We have explained that there are three fundamental predicates for the application of the doctrine, which are that "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." *Bornstein, supra*, 26 *N.J.* at 269, 139 *A.*2d 404. It is a doctrine that permits, but does not require, the jury to infer negligence, effectively satisfying that element of plaintiff's proofs.

We have permitted the doctrine to be applied in plaintiff's favor in a variety of factual settings, including the collapse of a stairway in a new building on which a plaintiff was standing, *Brown v. Racquet Club of Bricktown*, 95 *N.J.* 280, 289, 471 *A.*2d 25 (1984), or where a soda bottle explodes without warning, injuring a bystander, *Bornstein, supra*, 26 *N.J.* at 271–74, 139 *A.*2d 404, or where an automatic door at a supermarket suddenly swings backwards, injuring a patron who was trying to enter, *Jerista v. Murray*, 185 *N.J.* 175, 191–200, 883 *A.*2d 350 (2005) (examining

role of doctrine in attorney malpractice litigation resting on assert-
ed underlying failure to prove negligence in "suit within a suit").
This Court has thoroughly explored the origins of the theory, its
history in our courts, and its application in matters asserting
negligence, *see Szalontai v. Yazbo's Sports Café*, 183 *N.J.* 386,
398–400, 874 *A.*2d 507 (2005), and we need not reiterate that
history here. Instead, we turn to a consideration of the narrow
issue before us, which is the application of the doctrine to claims of
medical malpractice.

We first considered the possibility that the doctrine might have
some application in medical malpractice litigation in *Buckelew v.
Grossbard*, 87 *N.J.* 512, 525–26, 435 *A.*2d 1150 (1981). Recogniz-
ing that the ordinary medical negligence claim calls for expert
testimony to establish the applicable standard of care, we traced
the origins of the *res ipsa* doctrine and considered whether it
might have a role to play in what is most often litigation calling for
specialized proofs. *Id.* at 526–27, 435 *A.*2d 1150.

We noted that the original basis for the doctrine is found in
cases that rest on common knowledge, that is, cases in which an
ordinary juror, without any additional testimony on the subject,
can recognize that an event does not usually happen except
through negligence. *Ibid.* We commented that even in matters
asserting claims of medical negligence there are, of course, situa-
tions that fall within the common knowledge of jurors, in the sense
that the very act bespeaks negligence. *Id.* at 526, 435 *A.*2d 1150.
As an example, we pointed to our earlier decision in which we
permitted the inference in a matter in which a surgeon left a
sponge inside of a patient. *Ibid.* (quoting *Sanzari v. Rosenfeld*, 34
*N.J.* 128, 140, 167 *A.*2d 625 (1961)). In that circumstance, we had
permitted plaintiff to rely on common knowledge and had coupled
it with the use of a *res ipsa* charge to permit the jury to draw an
inference of medical negligence. *Id.* at 526–27, 435 *A.*2d 1150.

However, we commented in *Buckelew* that in the cases that we
had previously considered, as well as in the published opinions of
the appellate and trial courts, the asserted act of negligence by the

medical professional sufficient to support the *res ipsa* charge was itself a matter of common knowledge, with the courts otherwise appropriately rejecting the requested charge. *Ibid.* (citing cases).

In *Buckelew,* we expanded the potential for use of a *res ipsa* charge in the medical malpractice context by concluding that experts could provide the appropriate basis for the jury to be able to use the inference. *Id.* at 527, 435 *A.2d* 1150. In particular, we held that the basis for applying the doctrine could come from:

Expert testimony to the effect that those in a specialized field of knowledge or experience consider a certain occurrence as indicative of the probable existence of negligence is at least as probative of the existence of such a probability as the "common knowledge" of lay persons. We hold, therefore, that expert testimony to the effect that the medical community recognizes that an event does not ordinarily occur in the absence of negligence may afford a sufficient basis for the application of the doctrine of *res ipsa loquitur.*

[*Ibid.*]

Although we therefore extended the uses of *res ipsa* to cases in which the jury would not, by common knowledge alone, be able to draw the inference, we were careful to require that the expert who would offer the essential equivalent by explaining the commonly held beliefs in the relevant medical community be actually capable of doing so. *Id.* at 528–29, 435 *A.2d* 1150. That is, we added and specifically emphasized

this note of caution: it will not be sufficient for plaintiff's expert simply to follow slavishly a "common-knowledge-within-the-medical-community" formula. There must be some evidential support, experiential or the like, offered for the expert's conclusion that the medical community recognized that the mishap in question would not have occurred but for the physician's negligence. If the plaintiff's expert's direct and cross-examination provide no basis for the witness's "common knowledge" testimony other than the expert's intuitive feeling—in other words, no more than a flat-out statement designed to satisfy the "common knowledge" test— then the court should not apply the *res ipsa* doctrine to the proceedings.

[*Ibid.*]

Our cautionary language describing the appropriate underpinnings in expert testimony that are required for the use of the *res ipsa* charge has been relied upon by the appellate courts in a number of contexts. The Appellate Division has explained, for example, that "[t]he decision in *Buckelew* was not an invitation to a broader use of *res ipsa loquitur* .... to be applied in every

situation in which a medical procedure has an untoward result with an unknown cause," and has further explained that the expert testimony needed to support the charge is of a specific type. *Smallwood v. Mitchell*, 264 *N.J.Super.* 295, 298, 624 *A.*2d 623 (App.Div.1993). As the court explained in *Smallwood*,

[t]he first element of the *res ipsa loquitur* doctrine is not satisfied with testimony from plaintiff's expert that *in his or her opinion* the result does not occur unless the [doctor] was negligent; rather the required basis for *res ipsa loquitur* application is that *the medical community* recognizes that such a result does not occur in the absence of negligence.

[*Ibid.* (emphasis in original).]

■ A court need not provide a *res ipsa* instruction every time an expert advances an unsupported claim that an injury would not have occurred in the absence of negligence. Instead, the expert must provide, and must be qualified to provide, the opinion that the relevant medical community agrees that the injury ordinarily does not occur in the absence of negligence. *Buckelew, supra,* 87 *N.J.* at 528–29, 435 *A.*2d 1150; *see Saks v. Ng,* 383 *N.J.Super.* 76, 91–92, 890 *A.*2d 983 (App.Div.) (affirming trial court's decision not to give *res ipsa loquitur* instruction because plaintiff's expert "did not state that the medical community recognizes that [plaintiff's injury] does not ordinarily occur in the absence of negligence"), *certif. denied,* 186 *N.J.* 605, 897 *A.*2d 1059 (2006).

In the intervening years since we decided *Buckelew,* and in a variety of circumstances, our appellate courts have modified the *res ipsa* doctrine, creating a hybrid approach that they have referred to as the "conditional" *res ipsa* charge. Although first utilized in an ordinary negligence dispute, *see Terrell v. Lincoln Motel, Inc.,* 183 *N.J.Super.* 55, 60, 443 *A.*2d 236 (App.Div.1982) (applying to claim by hotel guest injured when falling through hotel's glass shower door), it is this theory that the dissenting member of the appellate panel concluded should have been a part of the jury charge in this trial. We turn, therefore, to a consideration of its origins and applications.

This Court first referred to "conditional *res ipsa* " in *Anderson v. Somberg,* 67 *N.J.* 291, 300, 338 *A.*2d 1, *cert. denied,* 423 *U.S.*

929, 96 *S.Ct.* 279, 46 *L.Ed.*2d 258 (1975). There, we considered whether a surgical patient in whose spine the tip of a surgical instrument, called a rongeur, broke off while he was unconscious was entitled to a *res ipsa* charge. *Id.* at 297, 338 *A.*2d 1. As part of our analysis of *res ipsa,* we discussed a theory that would apply in a situation in which there could be no negligence attributed to plaintiff, but in which the potentially negligent parties, all of whom were defendants, disputed responsibility. *Id.* at 298–99, 338 *A.*2d 1. We commented that in those circumstances, it would be equitable to shift the burden of proof to that group of defendants, remarking that this would be similar to the "conditional *res ipsa loquitur*" approach taken by the California courts. *Id.* at 299–300, 338 *A.*2d 1 (quoting *Quintal v. Laurel Grove Hosp.,* 62 *Cal.*2d 154, 41 *Cal.Rptr.* 577, 397 *P.*2d 161 (1965)).

In *Anderson,* we recognized that the California burden-shifting "development represent[ed] a substantial deviation from earlier conceptions of *res ipsa loquitur,*" *ibid.,* which is ordinarily a theory that permits an inference, but does not shift the burden of proof. In *Anderson,* this Court embraced a similar burden-shifting approach, based on a balancing of the rights of an entirely innocent plaintiff, who had no means of proving which of the defendants was the culpable party, against the superior knowledge of those defendants and the certainty that the negligent party was among them. *Id.* at 298–300, 338 *A.*2d 1. Although the resulting theory was similar to California's "conditional *res ipsa*" theory, we did not, and we have not, referred to it by that label. Nor, for that matter, is that the iteration of "conditional *res ipsa*" that we confront today.

Rather, this dispute centers on the "conditional *res ipsa*" theory that was first created by our Appellate Division and that, the dissenting judge asserts, should have supported the requested jury charge. This theory, unlike the California theory that permits shifting the burden of proof to defendants in specific circumstances, presumes that there is a disputed issue of fact, the

resolution of which would entitle plaintiff to the benefit of the *res ipsa* inference of negligence.

Thus, in *Terrell*, *supra*, the Appellate Division found that the critical factual issue for the jury was whether they believed plaintiff's testimony that, after he and his companion entered the shower and adjusted the water temperature to their satisfaction, "although the knobs had not been touched, . . . a burst of scalding hot water spurted forth and he fell through the door while attempting to force it open." 183 *N.J.Super.* at 57, 443 *A.*2d 236. In those circumstances, the Appellate Division concluded that a "conditional *res ipsa loquitur* charge" would be appropriate. *Id.* at 60, 443 *A.*2d 236. It reasoned that if the jury believed plaintiff's version of the facts, the accident, that is, the spurt of scalding water that led to the effort to escape and the injury, would not have happened in the absence of negligence. *Ibid.* The court explained its theory as follows:

[P]laintiff was entitled to a conditional *res ipsa loquitur* charge. The jurors should have been instructed to determine first whether the accident happened in the manner described by plaintiff. If they determined that the accident was not occasioned by a sudden burst of hot water as alleged, ordinary rules of negligence would be applicable. On the other hand, the jury should be further instructed that if they were to find that the accident did in fact happen in the manner described by plaintiff, they must further determine whether the three elements of *res ipsa* are present to justify an inference of defendant's negligence.
[*Ibid.*]

The panel commented that its analysis was based on its concern that the verdict sheet recording the jury's verdict for defendant offered no insight into what the jury had actually decided. *Id.* at 61, 443 *A.*2d 236. Although there was ample evidence from which the jury could have rejected plaintiff's factual scenario entirely, the panel concluded that there was also the risk that the jury had decided that plaintiff, having called no expert, had not borne his burden of proving negligence and had exonerated defendant on that ground. *Ibid.* In order to address that concern, the panel commented that on remand

[A]ll questions of liability remain for the jury's determination. Plaintiff's explanation may be entirely rejected by the jury in which event the *res ipsa* doctrine must be disregarded. The *res ipsa* instruction must be expressly conditioned upon

plaintiff's ability to prove his version of the incident by a fair preponderance of the credible evidence.

[*Ibid.*]

The "conditional *res ipsa*" theory was next invoked by the Appellate Division some eleven years later, in another case in which plaintiff had a factual theory as to how the accident occurred. In *Allendorf v. Kaiserman Enterprises*, 266 *N.J.Super.* 662, 630 *A.*2d 402 (App.Div.1993), plaintiff alleged that she was injured by an elevator door that closed on her and pinned her against the door frame, half in and half out of the elevator. She asserted that the door continued to push her against the wall with increasing pressure until she was finally able to escape. *Id.* at 667, 630 *A.*2d 402. Defendant appealed the jury's verdict in favor of plaintiff, arguing that the trial court erred by giving a *res ipsa* instruction. *Id.* at 666, 630 *A.*2d 402.

The Appellate Division affirmed the verdict, concluding that "[t]he trial court properly instructed the jury that the application of the *res ipsa loquitur* doctrine was conditional upon the jury accepting plaintiff's version of how the accident occurred." *Id.* at 670, 630 *A.*2d 402. As the panel explained:

If the evidence presents a factual issue as to how an accident occurred, and the *res ipsa loquitur* doctrine would be applicable under only one version of the accident, the court should give a "conditional" *res ipsa loquitur* instruction, under which the jury is directed first to decide how the accident happened and to consider *res ipsa loquitur* only if it finds that the accident occurred in a manner which fits the doctrine.

[*Id.* at 669, 630 *A.*2d 402 (citing *Terrell, supra*, 183 *N.J.Super.* at 59–61, 443 *A.*2d 236).]

As explained by the appellate panel, the propriety of the *res ipsa* charge rested on whether there was a factual dispute that could be resolved by the jury and that, if resolved in plaintiff's favor, would make the charge appropriate. *Ibid.*

The Appellate Division again resorted to its "conditional *res ipsa*" theory, extending it in 1998 to a case involving a claim of medical malpractice. *See Roper v. Blumenfeld*, 309 *N.J.Super.* 219, 706 *A.*2d 1151 (App.Div.), *certif. denied*, 156 *N.J.* 379, 718 *A.*2d 1208 (1998). In *Roper*, plaintiff consulted defendant, a

dentist, after a piece of her molar broke off while she was eating hard candy. *Id.* at 223, 706 *A.*2d 1151. Defendant extracted the tooth but was unable to remove the root, which had become deeply embedded in the bone. *Id.* at 224, 706 *A.*2d 1151. Because removing the root was beyond defendant's expertise, he referred plaintiff to an oral surgeon who performed that procedure the next morning. *Ibid.*

Plaintiff's malpractice complaint arose because she experienced numbness in her right chin and lower lip. *Ibid.* Critical to her claim against the dentist was her assertion that the numbness began shortly after the extraction he performed and prior to the further procedure performed by the oral surgeon. *Ibid.* That factual issue was highly disputed at trial, with plaintiff and several witnesses testifying that she complained of numbness, that her face was swollen and she was drooling, *id.* at 224–25, 706 *A.*2d 1151, while defendant presented evidence from the oral surgeon that she voiced no such complaint to him before he performed his procedure, *id.* at 226, 706 *A.*2d 1151. The factual dispute was central to her claim because the immediacy would support her contention that the dentist, who was the only defendant in the litigation, had injured the nerve. *Id.* at 224, 706 *A.*2d 1151. Her request for a *res ipsa* charge was denied, and the jury found that defendant did not deviate from the accepted standard of care. *Id.* at 223, 232, 706 *A.*2d 1151.

The Appellate Division reversed and remanded for a new trial, concluding that the trial court erred by failing to provide the sort of "conditional *res ipsa*" instruction that it had embraced in *Allendorf.* *Id.* at 234, 706 *A.*2d 1151. In doing so, the court commented that:

> "[i]f the evidence presents a factual issue as to how an accident occurred, and the *res ipsa loquitur* doctrine would be applicable under only one version of the accident, the court should give a 'conditional' *res ipsa loquitur* instruction, under which the jury is directed first to decide how the accident happened and to consider *res ipsa loquitur* only if it finds that the accident occurred in a manner which fits the doctrine."
>
> [*Id.* at 232, 706 *A.*2d 1151 (quoting *Allendorf, supra,* 266 *N.J.Super.* at 669, 630 *A.*2d 402).]

As the panel explained, "if the jury accepted plaintiff's evidence, *res ipsa loquitur* would apply." *Ibid.* That is, the appellate court concluded that the jury could infer that defendant had been negligent if it first found that "the onset of her numbness began with defendant's procedures and if it believed that[, as plaintiff's expert had testified,] the risk of damage to the . . . nerve was not a normal risk inherent in defendant's procedures on plaintiff's tooth." *Id.* at 234, 706 *A.*2d 1151. In applying its "conditional *res ipsa*" theory to the medical malpractice context, the panel commented that plaintiff had complied with the *Buckelew* requirement that she demonstrate, by expert evidence, agreement in the medical community that the injury bespeaks negligence. *Id.* at 232, 706 *A.*2d 1151.

Although there have been other references to the "conditional *res ipsa*" theory, they have been rare. Even in ordinary negligence cases there has apparently been only one other published decision utilizing the concept. *See Apuzzio v. J. Fede Trucking, Inc.,* 355 *N.J.Super.* 122, 129, 809 *A.*2d 812 (App.Div.2002) (considering application to claim that victims were injured when wheel became detached from passing truck and struck them). In the only other published decision discussing this theory, which arose in the medical malpractice context, the appellate panel found no error in the trial court's refusal to give a "conditional *res ipsa*" charge. *See Saks, supra,* 383 *N.J.Super.* at 91, 890 *A.*2d 983. That panel, faced with complex testimony and expert opinions about the cause of plaintiff's vision loss, concluded that plaintiff's expert had not provided the required basis needed for a conclusion that the injury "ordinarily bespeaks negligence" or that the medical community recognizes the injury to be one that meets that defining criteria. *Id.* at 91–92, 890 *A.*2d 983.

With this historical background to guide our analysis, we turn to the issues raised by the dissent.

## IV.

There are two issues raised by the dissent and, therefore, before us for review. First, we must consider whether, contrary

to our direction in *Buckelew,* plaintiff's experts lacked the training or experience needed to provide the foundational proofs required for a *res ipsa* charge in a medical malpractice case. That is, we must determine whether they were qualified to opine that it is common knowledge in the medical profession that this injury ordinarily occurs only because of negligence. Second, we are called upon to address whether this factual record supports a "conditional *res ipsa*" charge, should we elect now to embrace that concept.

We begin our analysis of the first question by briefly reviewing the essential principles governing the qualifications of experts. The well-established requirements are set forth in *N.J.R.E.* 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In general, as we have held, "[i]n terms of qualifications, an expert 'must be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert] opinion and to explain the basis of that opinion.'" *Agha v. Feiner,* 198 *N.J.* 50, 62, 965 *A.*2d 141 (2009) (second alteration in original) (quoting *State v. Moore,* 122 *N.J.* 420, 458–59, 585 *A.*2d 864 (1991)). More particularly, in the medical malpractice arena, we have held that the key is "whether [an expert] has sufficient knowledge of professional standards applicable to the situation under investigation to justify his expression of an opinion relative thereto." *Sanzari, supra,* 34 *N.J.* at 136, 167 *A.*2d 625 (finding physician qualified to provide expert testimony in claim about dentist's administration of anesthesia). Although for causes of action accruing after July 7, 2004, that determination must also take account of the provisions of the New Jersey Medical Care Access and Responsibility and Patients First Act, *N.J.S.A.* 2A:53A–37 to –42 (fixing qualifications in addition to *N.J.R.E.* 702 for medical malpractice experts), we need not consider them in this matter.

Nor need we explain in detail the requirements that we have traditionally imposed on those offered to testify as experts in medical malpractice matters in order to decide the issue presented in this appeal. The question before us is indeed a narrow one, because there can be no doubt that plaintiff's experts, being a board-certified orthopedist and neurologist, were qualified to offer opinions about the applicable standards of care. *See, e.g., Rosenberg v. Cahill*, 99 *N.J.* 318, 328–31, 492 *A.2d* 371 (1985) (holding that medical professionals may express opinions in overlapping fields with common education, training, and licensure); *Klimko v. Rose*, 84 *N.J.* 496, 506, 422 *A.2d* 418 (1980) (permitting physician to opine on matters relating to negligence claim against chiropractor); *Sanzari, supra*, 34 *N.J.* at 136–37, 167 *A.2d* 625 (noting overlap between fields of medicine and dentistry).

Rather, the dispute was whether the experts were qualified to testify about common knowledge in the medical profession so as to provide the foundational grounding we required in *Buckelew* for a *res ipsa* charge. That debate was largely focused on the fact that neither of them had been trained on or had performed the procedure that defendant employed. On that narrow question, we have previously held that such specific qualifications are not generally required. As we noted in *Sanzari, supra*, "an expert in a malpractice action need not have had personal experience with the situation under investigation to testify to the applicable standard of care. His knowledge may derive from observations of the methods used by members of the profession or from his study of professional treatises and journals." 34 *N.J.* at 137, 167 *A.2d* 625. Although an expert who lacks first-hand knowledge may offer a weak opinion that the jury therefore rejects, as long as he or she points to adequate support for his or her view, it will not equate with an inability to sufficiently demonstrate a basis for the opinion.

Certainly plaintiff's experts' lack of first-hand knowledge did not preclude them from offering their opinions that plaintiff's injury was caused by defendant's negligence. Nor were they precluded from offering their opinions that his injury was caused by a burn

sustained during the procedure. The question before us, however, is whether, in light of the cautionary language in *Buckelew* about the requirements imposed on an expert offered to provide the basis for a *res ipsa* charge, these experts were able to demonstrate that it was common knowledge in the medical community that this injury would not have happened in the absence of negligence. In that context, although their lack of first-hand experience alone would not necessarily preclude them from offering an opinion about what is common knowledge in the medical community, they failed to demonstrate that they had a basis on which they could so opine. That is, not only did they point to no training, education, or experience, they offered nothing from the medical literature as an alternate source of support for their assertion that it is commonly accepted in the profession that plaintiff's injury, that is, damage to the nerve root that resulted in the foot drop, would not have occurred in the absence of negligence during this procedure. That failure compels us to agree with the Appellate Division majority's view that they could not provide the required support for a *res ipsa* charge.

In reaching our conclusion, we reject the suggestion of the dissenting judge that the agreement by defendant's expert, and defendant himself, that burning the nerve root during the procedure would be negligent, sufficed to create the basis for the common knowledge prong of the *res ipsa* charge. On the contrary, because they provided the jury with an alternate, non-negligent, explanation for how the injury occurred, their testimony amply demonstrated that the happening of the injury does not "ordinarily bespeak negligence."

Apart from that failure in plaintiff's proofs, however, the record before us is not one in which the *res ipsa* charge would have any place. Even if we were to embrace the "conditional *res ipsa*" theory as articulated in the past by our Appellate Division in other decisions, a matter we need not address in light of the failure of the foundational proofs required by *Buckelew,* that novel theory would have no application in this case.

The "conditional *res ipsa*" theory proceeds from the premise that there is a question of fact that, if the jury decides it in plaintiff's favor, would entitle plaintiff to the *res ipsa* charge. As this case well illustrates, however, in a medical malpractice matter there will ordinarily not be a factual dispute that will serve as the predicate for a *res ipsa* charge. Rather, the factual disputes will, in general, be part and parcel of the debate between the experts.

For example, in *Saks, supra,* although the appellate panel based its decision on grounds relating to a failure of the foundational proofs, 383 *N.J.Super.* at 91–92, 890 *A.2d* 983, the opinion demonstrates the difficulty of pointing to a predicate fact for purposes of the "conditional *res ipsa*" theory in the medical malpractice context. The contested fact on which plaintiff relied was that, in his expert's opinion, defendant penetrated the optic nerve when administering anesthesia during eye surgery, thereby causing plaintiff's vision loss. *Id.* at 85–86, 890 *A.2d* 983. Defendant's expert countered that the vision loss was caused by a central retinal vein obstruction, an "untoward reaction to the surgery . . . . [due to] a stroke." *Id.* at 89, 890 *A.2d* 983. Implicitly-recognizing that in reality there was no predicate factual decision to be made that would support the "conditional *res ipsa*" theory, the panel commented that the competing expert opinions made it clear that there was no evidence that the injury that was sustained ordinarily does not occur in the absence of negligence. *Id.* at 91–92, 890 *A.2d* 983. The dispute in this case, like the one in *Saks,* is fundamentally a battle between experts with divergent views; it does not present an issue of fact that the jury could decide as a predicate for applying a *res ipsa* analysis.

In large part, the debate between the parties arises because they have an underlying, but unspoken, disagreement about what constitutes "the occurrence" for purposes of a *res ipsa* analysis. In plaintiff's view, "the occurrence" is the burn to the nerve root. From that viewpoint, he sees the question about whether the nerve root was burned as the kind of factual dispute that would fit within the "conditional *res ipsa*" theory. As defendant sees it, on

the other hand, "the occurrence" is the injury plaintiff suffered, that is, the diseased or damaged nerve root that resulted in the foot drop. From that vantage point, he sees no factual dispute that is not simply part of accepting or rejecting the opinions of plaintiff's experts on causation.

That underlying dispute, which can be easily resolved, illustrates the inherent flaw in plaintiff's "conditional *res ipsa*" argument. In this case, there was no dispute that it would have been negligent for defendant to burn the nerve root during the procedure. Instead, what was in dispute was whether the injury was caused by a burn or was instead the result of a previously damaged, "sick" nerve root. In that context, it becomes plain that it is the injury that plaintiff sustained, not the mechanism that caused it, that is "the occurrence." By suggesting that the jury be told first to decide whether the nerve root was burned and then to apply a *res ipsa* analysis, plaintiff attempts to transform a conclusion offered by an expert, that the jury can accept or reject in accordance with ordinary negligence concepts, into a fact for the jury to decide as a predicate for affording him the inference of negligence itself.

Were we to agree with plaintiff's argument about the application of "conditional *res ipsa*" to this matter, a *res ipsa* charge would always be given; plaintiff would always be able to articulate some aspect of the expert's opinion as if it were an issue of fact so as to demand it. Not only would the charge become routine, but it would effectively substitute an inference of negligence for plaintiff's ordinary burden of proving negligence, contrary to our longstanding jurisprudence. We see no ground on which to effect such a fundamental alteration of the burdens to be carried by parties in medical malpractice disputes.

We do not intend to create, nor have we created, a means for defendants in medical malpractice litigation to avoid the appropriate use of a *res ipsa* charge, a concern voiced by amicus, New Jersey Association for Justice. Nor do we intend to provide an avenue for medical malpractice defendants to prevent plaintiffs

from claiming the benefit of the *res ipsa* charge to which they would otherwise be entitled.

There is ample room in our jurisprudence for reliance on *res ipsa* as we have long defined its application in medical malpractice litigation. Because we agree with the appellate panel's majority that, in this matter, there was no basis for a *res ipsa* charge, or a "conditional *res ipsa*" charge, however, we leave for another day our consideration of the appropriate parameters, if any, of the latter theory.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.