NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1091-16T4

PATRICIA A. CZMYR,

 Plaintiff-Respondent,

v.

DARLENE S. ALDEROTY,

 Defendant-Appellant.
——————————————————————————————————

 Argued May 10, 2017 – Decided July 28, 2017

 Before Judges Lihotz, Hoffman and Whipple.

 On appeal from Superior Court of New Jersey,
 Law Division, Middlesex County, Docket No. L-
 4731-14.

 Lisa R. Marshall argued the cause for
 appellant (Law Offices of Viscomi & Lyons,
 attorneys; Ms. Marshall, on the brief).

 Charles F. Kenny argued the cause for
 respondent (LoPiano Kenny & Stinson,
 attorneys; Mr. Kenny of counsel and on the
 brief; Caitlin Rizzo, on the brief).

PER CURIAM

 Defendant Darlene S. Alderoty appeals from a Law Division

order granting plaintiff Patricia A. Czmyr a new trial. During

her cross-examination of plaintiff, defense counsel repeatedly
asked her, despite repeated objections, whether she remembered

complaining to her doctor about neck, back, and shoulder pain on

numerous occasions before the underlying accident. When plaintiff

said no, defense counsel told the jury she was showing plaintiff

her medical records to try to refresh her memory. Defense counsel

never admitted the records under an exception to inadmissible

hearsay. After the trial court issued a curative instruction, the

jury returned a $3200 verdict in favor of plaintiff. Plaintiff

moved for a new trial on damages, which the trial court granted,

finding the $3200 award "grossly inadequate" and concluding

defense counsel's inappropriate cross-examination "improperly

influenced" the jury. We affirm.

 I.

 We discern these facts from the trial record. On October 11,

2012, plaintiff stopped her car for a red light and then "was hit

from behind . . . and jolted . . . back and forth." Defendant

operated the rear-ending car. According to plaintiff, when she

got out of her car, "I just did not feel right, especially in my

head. . . . [I]t was very fuzzy, just a nauseous type of feeling,

very tight and tense, especially through the lower back up through

my neck." Plaintiff did not "feel there was a need to" call an

ambulance, so she drove to her original destination, her eye

doctor. When plaintiff's pain increased in the days following the

 2 A-1091-16T4
accident, she scheduled an appointment to see Edward Magaziner,

M.D., a pain management doctor who previously treated her following

motor vehicle accidents in 1992 and 2000. At her first

appointment, plaintiff presented complaints regarding her neck,

lower back, center back, shoulder, and right elbow.

 Dr. Magaziner saw plaintiff eight times over the course of

the next year. He recommended plaintiff undergo two courses of

physical therapy, which she completed from November 2012 through

March 2013, and from June 2013 through July 17, 2013. Dr.

Magaziner also referred plaintiff for chiropractic treatment,

which she received between August 2013 and April 2014. For

plaintiff's left shoulder injury, she received treatment from an

orthopedist, including three injections into her left shoulder.

Plaintiff testified the injections did not improve her

functioning, but did provide minimal pain relief. Plaintiff said

she declined her doctor's recommendation of shoulder replacement

surgery, but planned to receive another injection.

 Plaintiff also testified regarding prior injuries she

sustained, including: a 1992 motor vehicle accident, when she

incurred neck, back, and left knee injuries; a 1995 work-related

accident, when she sustained a left elbow injury; and a 2000 motor

vehicle accident, when she sustained neck, back, left shoulder,

right hand, and right thumb injuries. Plaintiff stated that prior

 3 A-1091-16T4
to the subject accident, she felt pain in her neck, back, or left

shoulder on some days, and other days she would feel no pain. She

described this pain as "frustrating," but said it did not interfere

with her functioning or activities of daily living. Plaintiff

described her left shoulder pain before the subject accident as

"intermittent," and "a seven" on a one–to-ten scale when she felt

pain; however, since the accident, she experiences "constant"

shoulder pain, which she rated "[a]bout a nine." Plaintiff said

the injuries to her left shoulder represent her biggest complaint.

 Plaintiff testified she currently takes over-the-counter

medications to alleviate her pain, explaining she does not want

to take narcotics. Plaintiff said she currently encounters

difficulty performing various activities of daily living, such as

dressing, bathing, and shaving, due to her neck, back, and left

shoulder pain and other limitations, particularly if the activity

involves reaching with her left arm. Plaintiff also described

difficulty performing yardwork and caring for her elderly rescue

dog, a golden retriever. Plaintiff stated she received no

treatment for her neck, back, or shoulder for approximately two

years before the subject accident.

 Plaintiff also presented the videotaped de bene esse

deposition of Dr. Magaziner, who testified plaintiff sustained the

following injuries as a result of the subject accident: L5-S1 disc

 4 A-1091-16T4
herniation; left supraspinatus rotator cuff tear; additional

ligament injury to the cervical, thoracic and lumbar spine, which

will not heal to function normally; and right elbow epicondylitis,

which resolved.

 Dr. Magaziner acknowledged plaintiff's previous medical

issues, noting she

 did have some arthritis in the shoulder. She
 did have arthritis in the neck and
 degenerative disc disease in the neck. She
 did have arthritis in the lower back and some
 disc bulges in her lower back and some
 degeneration in her lower back. She did have
 a history of what we call carpal tunnel
 syndrome and tarsal tunnel syndrome . . . .

On cross-examination, Dr. Magaziner acknowledged treating

plaintiff for neck, shoulder, lower back, and forearm injuries

after an automobile accident in 2000. He treated her every year

from 2003 to 2010. On July 28, 2010, he noted plaintiff was

"having a flare-up of pain in her left neck, left wrist, lumbar

back[,] and left shoulder. . . . [S]he has [a] known diagnosis of

cervical sprain superimposed on degenerative joint disc disease,

left shoulder tendonitis, tendonitis of the left wrist

superimposed on a degenerative process[,] and lumbar

sprain . . . ."

 Dr. Magaziner ultimately concluded plaintiff

 had an exacerbation of some previous injuries
 with the sprains to the neck, mid and lower
 back which now became chronic muscle spasms
 5 A-1091-16T4
 and [a] chronic pain situation. The shoulder
 injury[,] although she did have pre-existing
 degeneration in the shoulder, it was in this
 accident with the seatbelt holding yourself
 back and with the forces that occur with that,
 and we see all the time, it caused that rotator
 cuff . . . to tear[,] and . . . she developed
 a further sprain to that shoulder in terms of
 the AC joint that we discussed about before,
 and if I didn't mention it, the L5-1 disc
 herniation . . . .

 Defendant briefly testified about the accident, which she

described as "just a tap, that my bumper just tapped hers."

Defendant stated her vehicle sustained "no damage," and she did

not see any damage to plaintiff's car, only "a few scuff marks on

the bumper."

 Defendant then presented the videotaped de bene esse

deposition of her medical expert, Steven Hausmann, M.D., an

orthopedic surgeon. Dr. Hausmann reviewed plaintiff's MRIs from

two months before the accident1 and compared them with plaintiff's

MRIs from after the accident. He concluded all of plaintiff's

back and shoulder issues were degenerative, not traumatic, both

before and after the accident. He found no "objective evidence

that [plaintiff] sustained a permanent injury as a result of th[e]

accident." He did note, however, that she had "an exacerbation

1
 The record indicates plaintiff's cardiologist ordered the MRIs
in August 2012 as part of an initial cardiology workup.
 6 A-1091-16T4
of her degenerative disease, which means a temporary worsening due

to the impact from the accident."

 The focus of this appeal occurred during the cross-

examination of plaintiff, when defense counsel asked her four

times about various medical visits with her primary care doctor.

Defense counsel posed these questions even though she did not

intend to call the primary care doctor or any employee of his

office to introduce any of the doctor's office records.

Nevertheless, defense counsel proceeded with the following cross-

examination:

 Q: Do you recall going on October 19th of 2012
 to see your doctor for a follow up? It was a
 seven-month follow-up visit?

 A: Which doctor is that?

 Q: This is your primary care doctor . . . .
 Who is your primary care doctor?

 A: Is it Friedman?

 Q: Dr. Friedman. Yes.

 A: It was probably an appointment I had for
 months. Yes. I do follow up with him.

 Q: And do you remember complaining at that
 time of back and neck pain but no complaint
 of shoulder pain?

 A: That, I don't recall.

 [Defense counsel]: Okay. Your Honor, may I
 approach the witness?

 [The court]: Sure.
 7 A-1091-16T4
[Plaintiff's counsel]: Your Honor, I object.

[The court]: To her approaching the witness?

[Plaintiff's counsel]: Well, I'm anticipating
the next question. I'm just trying to avoid
a –

[The court]: Well, let's hear what the
question is.

[Plaintiff's counsel]: Okay.

[Defense counsel]: Thank you. . . . I'll mark
this as D-3.

[The court]: Okay. What is it?

[Defense counsel]: . . . . It's the medical
record.

 . . . .

[The court]: D-3 is, you say, her records?

[Defense counsel]: Yes.

[The court]: Okay.

[Defense counsel]: This is the medical record.

Q: And, at that time, your primary care doctor
said that you –

 . . . .

[The court]: That's objectionable. That's
hearsay.

[Defense counsel]: Let me . . . refer you to
that.

[Plaintiff's counsel]: Well, there's no
question pending, right?

 8 A-1091-16T4
[The court]: I know. She's just . . . having
her look at it to refresh her recollection.

[Plaintiff]: Okay.

Q: After reviewing this note, do you remember
going to see your primary care doctor?

A: No. I really don't.

Q: Okay. Do you remember your doctor
referring you to Dr. Magaziner?

A: I know at one point when I was at his
office, we discussed things like that, but I
don't remember when that was.

Q: You don't remember anything about that?

A: No.

Q: Do you remember making other complaints of
back and neck pain to your primary care doctor
in between that time period that you were just
asked about the year before the accident, a
year or two before, between 2010 and 2012? Do
you remember making any complaints?

A: Just general discussion.

Q: What do you mean by "general discussion?"

A: If he – like when you go to any doctor's
office, they ask, oh, if you have a pain or
what's been going on, that type of thing.

Q: Do you remember going on March 19th of 2010
and complaining about back pain?

A: No.

[Plaintiff's counsel]: Your Honor, . . . I
object for the same reason.

[The court]: Again, what are . . . you
asking if she remembers?
 9 A-1091-16T4
[Defense counsel]: Well, I can refresh her
recollection.

[The court]: No. You can't. It's not her
document. So the question is, what are you
asking her to recollect? If she doesn't
remember, she doesn't remember.

[Defense counsel]: I'm asking if she recalls
going and I thought I would have an
opportunity for her to look at the notes to
refresh her recollection.

[The court]: You can show her that to refresh
any recollection she may have, so you can go
through the same exercise again. We'll mark
it as D-4.

[Defense counsel]: Okay.

[The court]: And then you can ask the witness
if she remembers it.

 . . . .

[The court]: Just take a look at it and tell
us if you recall that visit to that doctor.

A: My name is on here. I guess I was there.

[The court]: The question is, do you recall
being at that visit?

A: No. I don't.

[The court]: Okay. Next?

Q: Do you remember making a complaint to the
doctor August 25th of 2010 that you were
having neck and back pain here and there?

[Plaintiff's counsel]: Your Honor, –

[The court]: Again, – again, let's go to
sidebar.
 10 A-1091-16T4
[Defense counsel]: Okay.

(Off-the-record discussion at side bar)

[The court]: Ladies and gentlemen of the jury,
just so you understand and I am instructing
you that these records are not authenticated,
not to be held by a witness, so they're
basically hearsay documents, which we don't
know how genuine they are or not. So,
therefore, that's why [h]e objected . . . [,]
and the objection is appropriate because
that's why they cannot even be read to the
witness at this time. So I'm going to ask
that [defense counsel] just continue the line
of questioning[,] and we'll continue from
there.

Q: Do you remember going to your doctor about
January 18th of 2011 because you had injured
your back while shoveling snow?

A: No. I don't.

[Plaintiff's counsel]: Your Honor, –

[The court]: Again, – well, –

[Plaintiff's counsel]: The same objection.

[Defense counsel]: Well, –

[The court]: Well, no. . . . [T]hat has
nothing to do with anything other than whether
or not she remembers having ever done that.
The answer is, no. The question is not
evidence. It's just the answer. So the answer
is no, she doesn't remember any such thing.

[Defense counsel]: May –

[The court]: You may continue.

 11 A-1091-16T4
 [Defense counsel]: May I show the witness a
 document just to see if it will refresh her
 recollection?

 [The court]: No. It's not her document. None
 of her documents are here.

 Q: And at the time of the . . . accident in
 2012, . . . do you remember if you were still
 feeling some pain in your neck and back around
 that time? You don't remember whether or not
 you were, correct?

 A: No. I don't remember that.

 Q: And . . . you can't say whether or not you
 were feeling pain in your left shoulder at the
 time of the 2012 accident either. Is that
 right?

 A: That's correct.

 By the end of plaintiff's testimony, the court realized that

defense counsel's cross-examination improperly presented plaintiff

with inadmissible documents in front of the jury.2 Recognizing

the need for a curative instruction, the next morning, before

summations, the judge gave the jury the following instruction:

 I . . . want to talk to you . . . before
 we get started about the defense [c]ounsel's

2
 At the new trial motion hearing, the judge offered the following
explanation for what occurred during the cross-examination of
plaintiff:

 I just think that it was unfortunate that
 these were records that were not
 authenticated. I, frankly, when they first
 started, I thought they were authenticated
 records. I thought there was no question
 about them being – you know, being identified
 and put into evidence and they weren't.
 12 A-1091-16T4
cross-examination of plaintiff and several
questions you asked regarding statements
allegedly made to a doctor.

 I want to remind you that the questions
were, in fact, improper. You have to
disregard the questions and any answers that
may have been given. Just because there's
been no evidence presented in this case
indicating that plaintiff complained to any
doctor regarding any pain or injury, other
than as testified to by Dr. Magaziner. What
he testified to is obviously evidence in this
case. You can disregard any assertion to the
contrary.

 While defense [c]ounsel may have been
reading from some document, those documents
have not been offered or admitted as evidence
in this case[,] and, therefore, they're
unauthenticated, unreliable, and inadmissible
under our rules of court[,] and as I explained
to you earlier when I gave you preliminary
instructions, the questions the attorneys ask
are not evidence. Only the answers are[,]
and . . . if I exclude something from evidence,
don't speculate or guess what it might even
say. And so only the answers given by the
witness are evidence. So you can at this point
disregard the line of questioning from the
defense [c]ounsel and the implications made
from those questions.

 I also want to remind you or instruct you
that plaintiff's [c]ounsel's objections were
proper[,] and that's to protect the jury from
unreliable and inadmissible evidence. So he
was obligated to make those instructions,
those objections. I wanted to make sure that
you understand that the plaintiff's [c]ounsel
could not be considered to have making any
objections to prevent you from hearing any
evidence or hiding anything from you. Any
evidence that's admissible will go to the
jury, just so you understand.

 13 A-1091-16T4
 After the defense rested, plaintiff moved for a directed

verdict on liability, citing Dolson v. Anastasia, 55 N.J. 2 (1959),

which the trial court granted. After the jury awarded damages of

only $3200, plaintiff filed a motion for a new trial or additur.

At the beginning of oral argument, the court said, "[C]learly,

it's a fairly low damage award. The question is why. I mean,

that's really the issue and is there anything about that

questioning, which, you know, pretty much makes the jury suspicious

of her[,] and that's really the issue." The court added:

 There's no question that there is evidence to
 support a jury verdict that she did not
 sustain significant long-term injuries
 . . . . But the problem is, to what extent
 is the jury verdict a reflection of that
 nagging credibility issue. That's the . . .
 crux of what [plaintiff's] argument is and,
 frankly, . . . at the time, . . . I thought
 there was a request for a mistrial, if I
 recall. And I . . . was willing to let the
 jury hear it and hope . . . maybe they would
 rehabilitate it[,] or he would be able to
 rehabilitate it. . . . [T]o me, the verdict
 is exceedingly low. There's no question about
 it.

 In response to defendant's argument that defense counsel's

cross-examination could not shock the jury because they knew

plaintiff had neck, back, and shoulder pain before the accident,

the court said, "I appreciate that, but the test is not

whether . . . the jury was shocked by it. The question is whether

it shocks my conscience that they came up with a number, which I

 14 A-1091-16T4
think is just grossly inadequate to even pain and suffering,

frankly."

 At the conclusion of oral argument, the court granted

plaintiff a new trial. The court explained,

 . . . I heard the whole trial[,] and . . . I
 can see the jury's reaction[,] and that, to
 me, is a significant issue[,] and I was
 concerned about it[,] and . . . I said on the
 record or at side bar . . . we'll see what the
 jury does with it[,] and I think the jury was
 influenced by it[,] and I think they were
 improperly influenced by it[,] and I think
 [plaintiff's counsel] characterized my
 curative instruction as valiant, which is
 nice, but it just seemed ineffective[,] and
 that's what it comes down to.

 Defendant then filed this appeal.

 II.

 A jury verdict is entitled to considerable deference, Risko

v. Thompson Muller Auto. Grp. Inc., 206 N.J. 506, 521 (2011), and

should not be set aside by a trial court unless, "after canvassing

the record and weighing the evidence, . . . the continued viability

of the judgment would constitute a manifest denial of justice."

Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977); see Risko,

supra, 206 N.J. at 521 ("[A] motion for a new trial should be

granted only after 'having given due regard to the opportunity of

the jury to pass upon the credibility of the witnesses, it clearly

and convincingly appears that there was a miscarriage of justice

under the law.'" (quoting R. 4:49-1(a)). Trial courts must refrain
 15 A-1091-16T4
from substituting their own conclusions for that of the jury

"merely because he [or she] would have reached the opposite

conclusion." Ibid. (alteration in original) (quoting Dolson,

supra, 55 N.J. at 6).

 Appellate review is guided by a similar standard. This court

reverses the grant or denial of a motion for a new trial only when

"it clearly appears that there was a miscarriage of justice under

the law." R. 2:10-1; see Bender v. Adelson, 187 N.J. 411, 431

(2006).

 A "miscarriage of justice" has been described
 as a "pervading sense of 'wrongness' needed
 to justify [an] appellate or trial judge
 undoing of a jury verdict . . . [which] can
 arise . . . from [the] manifest lack of
 inherently credible evidence to support the
 finding, obvious overlooking or under-
 valuation of crucial evidence, [or] a clearly
 unjust result. . . .'"

 [Risko, supra, 206 N.J. at 521 (alterations
 in original) (quoting Lindenmuth v. Holden,
 296 N.J. Super. 42, 48 (App. Div. 1996),
 certif. denied, 149 N.J. 34 (1997)).]

 "[A] civil plaintiff has a constitutional right to have a

jury decide the merits and worth of [his or] her case." Johnson

v. Scaccetti, 192 N.J. 256, 279 (2007) (citing N.J. Const. art.

I, ¶ 9). Our Supreme Court has long held:

 The decision on whether inadmissible evidence
 is of such a nature as to be susceptible of
 being cured by a cautionary or limiting
 instruction, or instead requires the more
 severe response of a mistrial, is one that is
 16 A-1091-16T4
 peculiarly within the competence of the trial
 judge, who has the feel of the case and is
 best equipped to gauge the effect of a
 prejudicial comment on the jury in the overall
 setting.

 [State v. Winter, 96 N.J. 640, 646-47 (1984).]

The same is true in civil cases, Khan v. Singh, 397 N.J. Super.

184, 202 (App. Div. 2007), aff'd, 200 N.J. 82 (2009), and for

comments by counsel, State v. Yough, 208 N.J. 385, 397 (2011).

"The determination of whether the appropriate response is a

curative instruction, as well as the language and detail of the

instruction, is within the discretion of the trial judge[.]" State

v. Wakefield, 190 N.J. 397, 486 (2007) (quoting State v. Loftin

(I), 146 N.J. 295, 365-66 (1996)), cert. denied, 552 U.S. 1146,

128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008).

 N.J.R.E. 612 allows the use of a writing, such as a medical

record, to refresh a witness's recollection. However, when a

writing is used for this purpose, "[t]he admissible evidence is

the recollection of the witness, and not the extrinsic paper."

State v. Carter, 91 N.J. 86, 123 (1982). Therefore, a trial court

has an obligation to prevent a witness or party "from putting into

the record the contents of an otherwise inadmissible writing under

the guise of refreshing recollection." State v. Caraballo, 330

N.J. Super. 545, 557 (App. Div. 2000). Notably, defendant does

not argue for the application of any hearsay exceptions commonly

 17 A-1091-16T4
used to introduce prior treatment records. See, e.g., N.J.R.E.

803(c)(6) (the exception for records of regularly conducted

activity); N.J.R.E. 803(c)(5) (the exception for recorded

recollection); N.J.R.E. 803(c)(4) (the exception for statements

for purposes of medical treatment or diagnosis). As noted, defense

counsel had no plan to call the primary care doctor or any employee

of his office to introduce any of the doctor's office records.

 "It is improper 'under the guise of "artful cross-

examination," to tell the jury the substance of inadmissible

evidence.'" United States v. Sanchez, 176 F.3d 1214, 1222 (9th

Cir. 1999) (quoting United States v. Hall, 989 F.2d 711, 716 (4th

Cir. 1993)). "The reason for this rule is that the question of

the cross-examiner is not evidence and yet suggests the existence

of evidence . . . which is not properly before the jury." State

v. Spencer, 319 N.J. Super. 284, 305 (App. Div. 1999).

 Nevertheless, defendant argues, "[b]ased on the evidence at

trial it was logical that a jury would find [plaintiff] sustained

only a temporary strain and award damages accordingly." To support

her argument, defendant cites Cuevas v. Wentworth, 226 N.J. 480,

486 (2016), in which our Supreme Court stated a trial judge may

not rely "on personal knowledge of other verdicts and on

purportedly comparable verdicts presented by the parties in

deciding whether to remit a pain-and-suffering damages award."

 18 A-1091-16T4
Because the trial court declined to grant plaintiff's motion for

additur and based its decision of the jury's reaction to defense

counsel's improper cross-examination of plaintiff, we conclude

Cuevas has no application here.

 Defendant next argues, "[t]he curative instruction in this

case was thorough in addressing any possible harm caused by [her

counsel's] cross-examan[ination] of [plaintiff]," and "[t]here is

no basis for finding that the jury did not follow the court's

instruction in this case." We disagree. Defense counsel asked

specific questions about three separate doctor's visits, and

defense counsel strongly implied she had medical records that

affirmatively answered those questions.

 First, defense counsel asked whether plaintiff had complained

of neck, back, or shoulder pain to her primary care physician

after the accident but before seeing Dr. Magaziner. When plaintiff

said she did not, defense counsel told the jury she had plaintiff's

medical records and then asked whether they helped her remember.

Plaintiff said no, but defense counsel effectively informed the

jury that she had complained of neck, back, and shoulder pain,

especially after she asked, "Do you remember your doctor referring

you to Dr. Magaziner?"

 Second, defense counsel asked whether plaintiff remembered

complaining to her primary care physician during the two years

 19 A-1091-16T4
prior to the accident. When plaintiff said she only recalled

general discussions, defense counsel asked whether she remembered

going to her primary care doctor on March 19, 2010, and complaining

about back pain. When plaintiff said no, defense counsel presented

her with medical notes, strongly implying they proved plaintiff

went to the doctor on March 19, 2010, and complained of back pain.

 Third, defense counsel asked plaintiff if she complained

about neck and back pain to her doctor on August 25, 2010. Once

again, when plaintiff said no, defense counsel asked the court for

permission to show another document to try to refresh plaintiff's

memory. Although the court denied defense counsel's request, this

exchange clearly informed the jury she had more medical records

supporting her questions.

 A trial court has an obligation to prevent a witness or party

"from putting into the record the contents of an otherwise

inadmissible writing under the guise of refreshing recollection."

Caraballo, supra, 330 N.J. Super. at 557. These medical records

were all inadmissible. Under the hearsay exception for records

of regularly conducted activity, N.J.R.E. 803(c)(6), defense

counsel failed to present any evidence concerning the method of

preparation of the records. Defense counsel never presented proof

of when the records were prepared, who prepared them, or what they

meant. Under the hearsay exception for recorded recollection,

 20 A-1091-16T4
N.J.R.E. 803(c)(5), the records do not contain plaintiff's

statements. Instead, they contain only statements from

plaintiff's primary care physician or another medical provider.

These statements may have shown the doctor's understanding of

statements made to him by plaintiff, but the record does not

contain any evidence supporting this conclusion.

 Under the hearsay exception for statements for the purposes

of medical treatment, N.J.R.E. 803(c)(4), the medical records do

not contain any statements from plaintiff, only statements from

her primary care physician. In the absence of testimony from the

doctor who wrote the records, defense counsel failed to establish

their admissibility under any hearsay exception.

 This court defers to a trial court's competence when the

trial court assesses whether "inadmissible evidence is of such a

nature as to be susceptible of being cured by a cautionary or

limiting instructor, or instead requires the more severe response

of a mistrial." Winter, supra, 96 N.J. 646-47. The trial court

"was concerned" after it "heard the whole trial" and saw "the

jury's reaction" to defense counsel's inappropriate cross-

examination. It found defense counsel's gamesmanship "improperly

influenced" the jury, and its "curative instruction . . . just

seemed ineffective." We defer to its factual findings and affirm

its order for a new trial on plaintiff's damages.

 21 A-1091-16T4
Affirmed.

 22 A-1091-16T4